UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

PANTHER PARTNERS INC., Individually
and on Behalf of All Others Similarly Situated,

                   Plaintiff,

   vs.

JIANPU TECHNOLOGY INC., DAQING
(DAVID) YE, YILU (OSCAR) CHEN,
JIAYAN LU, CAOFENG LIU, CHENCHAO
ZHUANG, JAMES QUN MI, KUI ZHOU,
YUANYUAN FAN, RONG360 INC.,
GOLDMAN SACHS (ASIA) L.L.C.,
MORGAN STANLEY & CO.
INTERNATIONAL PLC, J.P. MORGAN
SECURITIES LLC, and CHINA
RENAISSANCE SECURITIES (HONG
KONG) LIMITED, inclusive,

                   Defendants.

———————————————————— x

:  Civil Action No.

:  <u>CLASS ACTION</u>

:  COMPLAINT FOR VIOLATIONS OF THE
   SECURITIES ACT OF 1933

:  <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Panther Partners Inc. ("Plaintiff") makes the following allegations based upon the investigation undertaken by its counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Jianpu Technology Inc. ("Jianpu" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all purchases of Jianpu American Depositary Shares ("ADS") in and/or traceable to the Company's initial public offering (the "IPO") on or about November 16, 2017 seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.  The claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act [ 15 U.S.C. §§77k and 77o].

3.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §§1391(b) and (c).  The acts and conduct complained of herein occurred, in substantial part, in this District, as the IPO was marketed in this District.  In addition, the agent for service of process in the United States for the Beijing based Jianpu is located in this District; the Underwriter Defendants (defined below) for the IPO conduct substantial operations in this District; and the ADS of Jianpu are listed and trade on the New York Stock Exchange ("NYSE"), a national stock market located in this District.

4.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.     Plaintiff Panther Partners Inc. purchased Jianpu ADS pursuant to the IPO, as set forth in the accompanying certification incorporated by reference herein, and has been damaged thereby.

6.     Defendant Jianpu is a Beijing based technology company that possesses an independent online platform that provides users with research and recommendations on financial products in China.  The ADS sold in the IPO trade on the NYSE under the ticker symbol "JT," with two ADS representing five Class A ordinary shares of the Company.

7.     Defendant Daqing (David) Ye ("Ye"), a Jianpu co-founder, served as the Chairman of the Company's Board of Directors and its Chief Executive Officer at the time of the IPO.

8.     Defendant Yilu (Oscar) Chen ("Chen"), served as the Chief Financial Officer of the Company at the time of the IPO.

9.     Defendants Jiayan Lu ("Lu"), Caofeng Liu ("Liu"), Chenchao Zhuang ("Zhuang"), James Qun Mi ("Mi"), Kui Zhou ("Zhou"), and Yuanyuan Fan ("Fan") each served as a Director of the Company at the time of the IPO.

10.     Defendants Ye, Chen, Lu, Liu, Zhuang, Mi, Zhou and Fan each signed the materially inaccurate Registration Statement (defined below) issued in connection with the IPO and are collectively referred to herein as the "Individual Defendants."

11.     Defendant Rong360 Inc. ("Rong360") is Jianpu's parent company and is the holder of 83.4% of the Company's equity capital and 98% of the Company's voting rights.  Jianpu was 100% owned by Rong360 prior to the IPO.

12.     Defendants Goldman Sachs (Asia) L.L.C. ("Goldman Sachs"), Morgan Stanley & Co. International plc ("Morgan Stanley"), J.P. Morgan Securities LLC ("J.P. Morgan") and China Renaissance Securities (Hong Kong) Limited ("China Renaissance") each served as joint book-running underwriters for the IPO and are collectively referred to herein as the "Underwriter Defendants."  Collectively, Underwriter Defendants received commissions and other professional fees of approximately $12.6 million in connection with the IPO.

13.     The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement for the IPO and failed to perform adequate due diligence in connection with their roles as underwriters.  As a result, the Underwriter Defendants were negligent in failing to ensure that the Registration Statement for the IPO was prepared accurately and in accordance with the rules governing its preparation.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

14.     Unless otherwise noted, Defendant Jianpu, the Individual Defendants and the Underwriter Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

15.     Founded in 2011, Defendant Jianpu operates an on-line platform under the brand name "Rong360" in the People's Republic of China.  Generally, the Company's technology: (i) allows users to access information on credit card, consumer loan, and wealth management products; (ii) recommends loans and credit cards to individual users; and (iii) assists financial service providers in targeting users with specific financial needs and/or credit profile characteristics. Jianpu's platform also provides advertising, marketing, and other services to credit card and wealth management product providers.

16.     The Company's revenues are primarily generated from fees paid by financial service providers for loan recommendation services.  To a lesser extent, Jianpu receives revenue from financial service providers of credit cards and wealth management products for display and performance-based advertising and marketing services.

17.     On October 20, 2017, Jianpu filed with the SEC a Form F-1 Registration Statement (the "Registration Statement") for the IPO.  The Registration Statement was declared effective by the SEC on November 15, 2017.

18.     On November 17, 2017, Jianpu filed with the SEC a prospectus (the "Prospectus"), which forms part of the Registration Statement, for the IPO offering to sell to the public 22.5 million ADS (excluding the underwriters' option to purchase an additional 3.375 million ADS) at a price of $8.00 per ADS.  Thereafter, Jianpu sold 22.5 million ADS in the IPO and raised approximately $164.9 million therefrom, net of underwriting discounts and commissions and other offering expenses.

19.     In the years prior to the IPO, peer-to-peer lending (also referred to as P2P lending) in China experienced explosive growth.  P2P lending is the practice of lending money to individuals or businesses through online services that match lenders with borrowers.  Since peer-to-peer lending companies operate online and have lower overhead, lenders can earn higher returns compared to savings and investment products offered by traditional banking institutions.  That, coupled with many small Chinese borrowers being crowded out of the formal lending system by big corporations, allowed China to quickly become the largest P2P market in the world.

20.     The rapid rate of growth in P2P loans in China, many of which are small, unsecured and short-term in nature, also led to a sharp rise in fraudulent lending activity, particularly because

the oversight of the rapidly growing P2P marketplace was fragmented, with monetary policy and financial regulation in China being conducted on a regional basis.

21.     Prompted by a series of fraudulent P2P scandals, the Chinese government sought to clean-up clean up the industry in 2016 by adopting stringent new regulations and forming the cabinet-level Financial Stability and Development Committee ("FSDC") in mid-2017, responsible for reforming China's fragmented regulatory oversight.  These measures were widely expected to disqualify a significant majority of P2P lenders in China and, consequentially, dramatically reduce the total number of existing, as well as potential, financial service providers that traditionally had been the source of Jianpu's revenue.

22.     For example, on January 8, 2017, *The Epoch Times*, an independent, global news source focusing on uncensored China news, culture and science, reported that the China Banking Regulatory Commission and three other Chinese regulators issued rules in August 2016 requiring P2P lending companies to, among other things, appoint qualified banking institutions as custodians and disclose their use of deposits.  Significantly, *The Epoch Times* reported that **"[o]nly** 200 P2P lenders - *a fraction of the P2P industry* which is believed to have between 2,500 to 3,000 total lenders-*are expected to pass the regulatory review process and remain viable by next year*, according to estimates by the South China Morning Post."[1]

23.     In addition, the *South China Morning Post*, Hong Kong's newspaper of record, reported on February 19, 2017 that "***China regulators warn that 90 pc of peer-to-peer lenders could fail in 2017***."  According to the article, ***"[n]ine out of 10 of the mainland's peer-to-peer (P2P) lending platforms will struggle to survive this year as the government rolls out tightened***

---

[1]     Emphasis herein is added unless otherwise noted.

*regulatory supervisions*, according to a multi-agency report on Friday led by the Beijing Bureau of Financial Work."

24.     On July 15, 2017, *Reuters* reported that Chinese President Xi Jinping announced that China was in the process of forming the FSDC under the State Council, or cabinet.  According to *Reuters*, the FSDC was expected to help coordinate financial reforms, as well as market regulation and monetary and industrial policy.  In addition, *Reuters* reported that Xi Jinping stated the People's Bank of China "will take on a bigger role in macro-prudential management and in averting systemic risk in the financial system."

25.     On November 16, 2017, *Insurance Business Magazine* (Asia) explained that the FSDC would act to unify financial regulations in China, stating, in pertinent part:

> The FSDC will also play a unifying role for the four major financial regulators in China, according to a report by Economic Information Daily, a newspaper under state media arm Xinhua.

> The People's Bank of China, the China Banking Regulatory Commission, the China Insurance Regulatory Commission, and the China Securities Regulatory Commission make policies independently, but as finance sectors become increasingly intertwined, the FSDC will act as a bridge.

26.     As detailed below, the Registration Statement was negligently prepared and as a result, contained untrue statements of material fact and omitted to state other facts necessary to make the statements made therein not misleading.

27.     In addition, applicable SEC rules and regulations required the Registration Statement to disclose the material events and uncertainties associated with the change in China's P2P regulatory environment that were known by Defendants and reasonably likely to have material effect on the Jianpu's future operating results.  In violation of the rules and regulations governing its preparation, the Registration Statement failed to contain any such disclosure.  Lastly, the

Registration Statement was required to disclose the most significant factors that made the IPO risky

or speculative, which it did not.

28.     As of the filing of this Complaint, Jianpu's ADS traded at approximately $4.75 per

ADS, or approximately 40% less than the IPO price.

**The Registration Statement Contained Inaccurate Statements of
Material Fact and Omitted Material Information Required to Be Disclosed Therein**

29.     The Registration Statement highlighted the strong underlying drivers of growth and

opportunity for companies like Jianpu, stating, in pertinent part, as follows:

> China's rapid economic growth has been accompanied by the emergence of a
> growing middle class population driving strong domestic consumption.  The retail
> consumer finance market in China is underdeveloped due to a lack of credit
> infrastructure and a lack of sufficient, operational efficiencies and risk management
> and technological capabilities of financial service providers.

> Consumers in China have a relatively low level of consumer debt as compared to
> those in more developed countries, though this is changing.  The key drivers for
> growth include changes in consumer attitudes due to China's economic
> transformation, increasing focus by financial service providers on historically
> underserved mass market, shift of consumer demand from offline to online,
> proliferation of new financial service providers, favorable regulatory environment
> such as interest rate liberalization, and technological advancements such as artificial
> intelligence and big data.  There are also other strong underlying drivers supporting
> growth across consumer loans, small and medium enterprise, or SME, loans,
> mortgage loans, auto loans and wealth management products.

> China's internet population has grown rapidly and Chinese consumers have been
> quick to adopt internet and mobile technology in the financial services sector.
> Financial products are increasingly distributed through online platforms in China.
> The underdeveloped nature of the retail financial markets in China results in
> opportunities for online platforms to develop innovative business models to address
> unmet consumer demand, skipping the evolutionary stages in financial services as
> historically observed in more developed markets.  The transaction in the online
> lending market grew from RMB 0.7 trillion (US$103.3 billion) in 2012 to RMB 6.2
> trillion (US$914.5 billion) in 2016 representing a compound annual growth rate, or
> CAGR of 73.5%, and is expected to grow from RMB 10.7 trillion (US$1,578.3
> billion) in 2017 to RMB 40.4 trillion (US$5,959.3 billion) in 2020 representing a
> CAGR of 55.9%, according to the iResearch Report.

> Online platforms for financial products help increase access, provide choice, improve
> quality, accelerate the speed of decision making, enhance security and lower costs in

a transparent manner.  There is significant opportunity to deliver simple and inclusive financial services to the under-served population in China by leveraging big data and technology.  In particular, there are market opportunities across the value chain connecting users and financial service providers including online sales and marketing, data and risk solutions, IT solutions and loan servicing.  This market opportunity grew from RMB 77.6 billion (US$11.4 billion) in 2012 to RMB 294.0 billion (US$43.4 billion) in 2016 representing a CAGR of 39.5%, and is expected to grow from RMB 452.2 billion (US$66.7 billion) in 2017 to RMB 1,669.7 billion (US$246.3 billion) in 2020 representing a CAGR of 54.6%, according to the iResearch Report.

Independent open platforms that can provide integrated solutions have the added benefits of impartiality, improved user experience, wide ranging and differentiated product offerings, broader and deeper network of financial service providers, data advantage and an asset-light business model.

30.     The Registration Statement also disclosed that Jianpu had been able to capitalize on the above noted opportunities and that Jianpu had experienced substantial growth in the years leading up to the IPO, stating, in pertinent part, as follows:

We have experienced substantial growth since the commencement of our operations, and our management team has a strong track record of executing our strategies.  We introduced loan recommendation services in the first quarter of 2012, credit card recommendation services in the third quarter of 2013 and wealth management information services in the second quarter of 2014.  We introduced our big data risk management solutions in the second quarter of 2015 and our Gold Cloud system in the first quarter of 2016.  Our revenues increased by 112% from RMB 168.4 million in 2015 to RMB 356.4 million (US$52.6 million) in 2016, while our net loss decreased by 7.2% from RMB 196.2 million to RMB 182.1 million (US$26.9 million) over the same period.  Our revenues increased by 170% from RMB 145.9 million in the first half of 2016 to RMB 393.4 million (US$58.0 million) in the first half of 2017, while our net loss decreased by 53.2% from RMB 104.6 million to RMB 49.0 million (US$7.2 million) over the same period.

31.     Further, the Registration Statement set forth the key factors that contributed to Jianpu's operating success, including, in pertinent part, the following:

***Economic and industry trends in China***

The growth in consumer lending in China in recent years has been supported by generally rising consumer demand and increased willingness to assume credit. Consumer demand has increased as China's emerging middle class has enjoyed more disposable income, and Chinese consumers have been more willing to take on debt in an environment of relative economic stability and good employment prospects.  With

- 8 -

the rapid growth in China's internet population, financial service providers have been seeking online channels to access those segments of the population that previously have been underserved, including the younger generation of potential customers that increasingly prefer mobile access to the internet. In addition, new technology-enabled financial service providers have emerged to compete with traditional financial institutions and take advantage of this market opportunity, which in turn gives traditional financial institutions an incentive to utilize online channels. Lending to SMEs has also grown rapidly in China as SMEs have grown significantly and more financial service providers have been focusing on SME lending. The growth of our business will depend in part on the continuation of these trends. [Emphasis in the original.]

### Effectiveness of matching and recommendation

The revenue and growth of our recommendation services for financial service providers primarily depend on the effectiveness of our matching and recommendation capabilities. We rely on our data insights and proprietary technologies to efficiently match users with the financial products most suitable to their needs and increase the success rate of their applications to attract users to our platform. In turn, our user base enables us to serve financial service providers in reaching and serving their target customers more effectively through online and mobile channels. As we generate the majority of our revenues from recommendation services for financial service providers, we must continually enhance our data insights and strengthen our proprietary technologies to improve our matching and recommendation capabilities. [Emphasis in the original.]

*       *       *

### Expansion of our user base and user activity

Although we generate our revenue primarily from fees that we charge financial service providers, their demand for our services and solutions largely depends on our ability to help them reach and serve their target customers. Therefore, the size and characteristics of our user base on our platform significantly affect our revenue and results of operations. We must maintain a large and active user base that is geographically and demographically diverse. We have incurred significant expenses and devoted considerable resources to marketing activities and user traffic acquisition as we have grown our business, and we expect to continue to incur significant expenses as we grow. To achieve profitability, we must be able to retain and expand our user base and user activity in a cost effective manner. Emphasis in the original.]

*       *       *

### Regulatory environment in China

The PRC government has not adopted a clear regulatory framework governing the young and rapidly evolving online consumer finance market, and we expect that the

regulatory framework will remain unclear for some time to come.  If the PRC government adopts stringent regulations on financial service providers in the online consumer finance market, the growth of that market may slow, which may limit our growth.  If they impose specific requirements (including licensing requirements) on us, the requirements may be difficult or costly for us to comply with.  Regulations may be adopted in a way that favor competing business models or that disadvantage the internet finance industry as a whole in comparison to traditional financial institutions.  [Emphasis in the original.]

32.     The statements referenced in ¶¶29-31 above were inaccurate statements of material fact and/or omitted material information required to be disclosed to make such statements not misleading, including, *inter alia*, the following:

(a)     that the China Banking Regulatory Commission and three other Chinese regulators issued rules in August 2016 requiring P2P lending companies to, among other things, appoint qualified banking institutions as custodians and disclose their use of deposits;

(b)     that China had determined to create the FSDC under its State Council to coordinate major financial reforms, as well as to implement market regulation and monetary and industrial policy;

(c)     that (a) and (b) above would likely result in the disqualification of a significant majority of P2P lenders in China resulting in a dramatic reduction in the total number of existing, as well as potential, financial service providers that had been the source of Jianpu's revenue; and

(d)     that based on the foregoing, the disclosure in the Registration Statement concerning the Company's historical growth, favorable regulatory environment, proliferation of new financial service providers, on-line lending market, opportunity to deliver financial services, industry trends, and user base was materially incomplete, inaccurate and misleading.

33.     On November 21, 2017, just **two business days** after the IPO, several new sources announced that the FSDC issued an urgent notice to provincial governments urging them to suspend

regulatory approval of new internet, micro loan companies.  That day, *Reuters* issued a news report

titled "China clamps down on online micro lending; U.S.-listed shares plunge," stating, in pertinent

part:

> A top-level Chinese government body issued an urgent notice on Tuesday to provincial governments urging them to suspend regulatory approval for the setting up of new internet micro-lenders, sources who had seen the notice told Reuters.
>
> The multi-department body, tasked by the central government to rein in risks in the internet finance sector, also told local regulators to restrict granting of new approvals for micro-loan firms to conduct lending across regions, according to the sources.
>
> \*       \*       \*
>
> Beijing started a relentless crack down on the internet finance sector last year, issuing guidelines and rules to regulate online financial activity following a spate of scandals, frauds and high-profile peer-to-peer (P2P) failures.
>
> The clean-up has led to the creation of a top-level body comprising government entities that include the central bank and the banking regulator.
>
> The crackdown on micro-lenders comes as authorities warn about rising household debt, which includes mortgages and consumer loans.
>
> Unsecured consumer lending via Chinese online platforms more than tripled last year to almost $140 billion, according to a recent report by the Cambridge Centre for Alternative Finance.

34.    Following the issuance of the above noted news reports, the price of Jianpu ADS

plunged more than *38%* during the three day period ended November 24, 2017 on extremely heavy

trading volume, closing at $4.90 per ADS.

35.    In addition to the foregoing, Item 4 of Form F-1, via reference to Form 20-F, required

that the Registration Statement to disclose "**information regarding any governmental** economic,

fiscal, monetary **or political policies or factors that** have materially affected, or **could materially**

**affect, directly or indirectly, the company's operations** or investments by host country

shareholders."  In this regard, Form 20-F makes reference to the SEC's interpretive release (No.

- 11 -

33-6835) dated May 18, 1989 (the "Interpretative Release") for guidance in preparing the discussion

and analysis by management.  According to the Interpretative Release, in pertinent part:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> *        *        *
>
> **Events that have already occurred or are anticipated often give rise to known uncertainties**.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  **In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required**.

36.     In violation of the foregoing rules and regulations, the Registration Statement failed

to disclose the governmental policies associated with the P2P regulatory changes in China that were

reasonably likely to, and did, have a material effect on Jianpu's future operations.

37.     Further, Item 3 of Form F-1 required the Registration Statement to furnish the

information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], *Risk Factors*.  Item

503 of Regulation S-K required the Registration Statement to disclose the most significant matters

making an investment in IPO risky, which it did not.

38.     In this regard, the Registration Statement negligently made reference to ***potential***

risks associated with Chinese laws and regulations governing financial service businesses when, in

fact, such risks were ***existing***.

39.     For example, the Registration Statement stated the "PRC government ***may*** adopt a

stringent regulatory framework for the online and mobile consumer finance market in the future, and

impose specific requirements (including licensing requirements) on market participants," and the

"PRC government *may* also enhance the implementation of existing laws and regulations," stating,

in pertinent part, as follows:

> Our business or the businesses of **our financial service providers may be subject to a variety of PRC laws and regulations governing financial services**.  The application and interpretation of these laws and regulations are ambiguous and **may be** interpreted and applied inconsistently between different government authorities.  In particular, the PRC government has not adopted a clear regulatory framework governing the new and rapidly-evolving online consumer finance market, which is the source of the transactions that our platform facilitates.  As of the date of this prospectus, we have not been subject to any material fines or other penalties under any PRC laws or regulations on our business operations.  **The PRC government may adopt a stringent regulatory framework for the online and mobile consumer finance market in the future, and impose specific requirements (including licensing requirements) on market participants.   The PRC government may also enhance the implementation of existing laws and regulations**.

40.     In addition, the risk factors in the Registration Statement inaccurately referred to the

adoption of *potential* new regulations on financial service providers as being "media speculation."

The Registration Statement inaccurately disclosed, in relevant part, as follows:

> There has been **media speculation that the PRC government may, among other things, (i) impose new regulations on fees and interest charged by financial service providers, (ii) introduce licensing requirements for online lenders, (iii) close down unlicensed financial service providers that take deposits from consumers and (iv) close down financial service providers that engage in illegal collection practices**.  A significant number of financial service providers on our platform operate in the online and mobile consumer finance market.  Consequently, new government laws and regulations, stricter enforcement of existing laws and regulations or even speculation regarding such developments may materially and adversely affect our business, financial condition and prospects.  It may be costly for us to comply with applicable PRC laws and regulations.  If our practice is deemed to violate any existing or future laws and regulations, we may face injunctions, including orders to cease illegal activities, and may be subject to other penalties as determined by the relevant government authorities.

41.     The Registration Statement also negligently referred ***potential*** risks associated the

termination of relationships with financial service providers when, in fact, such risks were ***existing***.

The Registration Statement inaccurately disclosed, in relevant part, as follows:

- 13 -

Financial products and financial institutions are strictly regulated in China.  We are not regulated as a financial institution, but we **may be** indirectly subject to PRC financial regulations as a result of the financial products on our platform and our services to and cooperation with financial service providers.  If any financial product on our platform is deemed to violate any PRC laws or regulations, we may be liable for listing the product or assisting in offering the product on our platform, even if we are not its provider.  If any of our financial service providers is deemed to violate any PRC laws or regulations, we may be jointly liable due to the services or solutions we provide.  **We may have to remove financial products from our platform or terminate relationship with financial service providers**.  As of the date of this prospectus, we have not been subject to any fines or other penalties under any PRC laws, rules or regulations.  However, if any financial product on our platform is deemed to violate any laws, rules or regulations, we may face, among others, regulatory warnings, correction orders, condemnation, fines and criminal liability.  As a result, our business, reputation, financial performance and prospects could be materially and adversely affected.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action on behalf of a class consisting of all purchasers of Jianpu ADS pursuant and/or traceable to IPO (the "Class").  Excluded from the Class are Defendants and their families, the officers, directors and affiliates of the Defendants, and members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  Jianpu ADS are actively traded on the NYSE and 22.5 million ADS were sold in the IPO.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Jianpu or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

44.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether statements in the Registration Statement misrepresented material facts about the business, operations and risks of investing in Jianpu; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of §11 of the Securities Act
### (Against All Defendants Except Rong360)

48.     Plaintiff repeats and re-alleges each and every allegation contained above.

49.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except Rong360.  For purposes of this Count, Plaintiff

does not claim that Defendants engaged in intentional or reckless misconduct or that Defendants acted with fraudulent intent.

50.     The Registration Statement was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not inaccurate, and omitted to state material facts required to be stated therein.

51.     Jianpu was the registrant for the IPO.  As an issuer of securities to the public, Jianpu is strictly liable to Plaintiff and the Class for the materially inaccurate statements in the Registration Statement, the failure of the Registration Statement to be complete and the failure of the Registration Statement to disclose material information required pursuant to the regulations governing its preparation.

52.     The Individual Defendants signed the Registration Statement either personally or through an Attorney-in-Fact and caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  The Individual Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact.  As such, the Individual Defendants are strictly liable to Plaintiff and the Class.

53.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the IPO was prepared properly and accurately.  The Underwriter Defendants' failure to conduct

an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As such, the Individual Defendants are strictly liable to Plaintiff and the Class.

54.     The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.  None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate.  By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

55.     At the time of the purchases of Jianpu ADS, Plaintiff and the other members of the Class were without knowledge of the facts associated with the wrongful conduct alleged herein.  As a result of Defendants' violations, the price of Jianpu ADS declined substantially and Plaintiff and other members of the Class sustained damages.

**COUNT II**

**For Violation of §12(a)(2) of the Securities Act**
**(Against All Defendants)**

56.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

57.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Plaintiff and the Class, against all Defendants.  For purposes of this Count, Plaintiff affirmatively states that it does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

58.     Defendants named in this Count were sellers and offerors and/or solicitors of purchasers of the securities offered pursuant to the Registration Statement and Prospectus.  Defendants issued, caused to be issued and/or signed the Registration Statement in connection with

the IPO.  The Registration Statement contained a Prospectus that was used to induce investors, such as Plaintiff and the other members of the Class, to purchase the ADS offered by Jianpu.

59.     The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit.  But for their participation in the IPO, including their solicitation as set forth herein, the IPO could not, and would not, have been accomplished.  Specifically, the Underwriter Defendants:

(a)     made the decision to conduct the IPO and do it at the price set forth in the Prospectus.  The Underwriter Defendants drafted, revised and/or approved the Prospectus and participated in its being declared effective by the SEC.  The Prospectus was calculated to create interest in Jianpu ADS and was widely distributed by, or on behalf of, the Underwriter Defendants for that purpose; and

(b)     conceived and planned the IPO and orchestrated all activities necessary to affect the sale of Jianpu ADS to the investing public by issuing, promoting and supervising the distribution and ultimate sale of Jianpu ADS to the investing public.

60.     As set forth above, the Registration Statement and Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included preparing the defective and inaccurate Prospectus and participating in efforts to market the IPO to investors.

61.     Defendants owed the purchasers of Jianpu ADS, including Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus and to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.  Defendants, in the exercise

of reasonable care, should have known that the Registration Statement and Prospectus contained misstatements and omissions of material fact.

62.     Plaintiff and the other members of the Class purchased or otherwise acquired Jianpu ADS pursuant to the Registration Statement and Prospectus, and neither Plaintiff nor the other Class members knew, of the untruths, inaccuracies and omissions contained in the Registration Statement and Prospectus.

63.     By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff, individually and on behalf of the Class, hereby offers to tender to Defendants those shares of ADS that Plaintiff and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their ADS are entitled to rescissory damages.

## COUNT III

### For Violation of §15 of the Securities Act
### (Against Rong360 and the Individual Defendants)

64.     Plaintiff repeats and re-alleges each and every allegation contained above.

65.     This Count is asserted by Plaintiff against Rong360 and the Individual Defendants for violations of Section 15 of the Securities Act.  For purposes of this Count, Plaintiff does not claim that Rong360 or the Individual Defendants engaged in intentional or reckless misconduct or that the Individual Defendants acted with fraudulent intent.

66.     Rong360 and the Individual Defendants acted as controlling persons of Jianpu within the meaning of Section 15 of the Securities Act.  By reason of their ownership interest, senior management positions and/or directorships at the Company, Rong360 and the Individual Defendants individually, and acting pursuant to a common plan, had the power to influence and exercised the same to cause Jianpu to engage in the conduct complained of herein and were therefore control

persons of Jianpu.  By reason of such conduct, Rong360 and the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

67.     Rong360 and each of the Individual Defendants was a culpable participant in the violation of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding Plaintiff and the other members of the Class damages together with interest thereon;

C.     With respect to Count II, ordering rescission or a rescissory measure of damages;

D.     Awarding Plaintiff and the other members of the Class the costs and expenses of this litigation, including reasonable attorneys' fees, accountants' and experts' fees, and other costs and disbursements; and

E.     Awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 25, 2018

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN


_/s/ SAMUEL H. RUDMAN_
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ABRAHAM FRUCHTER
  & TWERSKY, LLP
JACK G. FRUCHTER
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: 212/279-5050
212/279-3655 (fax)
jfruchter@aftlaw.com

_Attorneys for Plaintiff_

CERTIFICATION OF PANTHER PARTNERS INC.
IN SUPPORT OF CLASS ACTION COMPLAINT

Panther Partners Inc. (Plaintiff) declares, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a complaint against Jianpu Technology Inc. prepared by counsel in the above-captioned case and has authorized its filing.

2.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff purchased 1,050 Jianpu Technology Inc. American Depositary Shares (ADS) at a price of $8.00 per share in the Initial Public Offering.  Plaintiff sold those 1,050 ADS on January 16, 2018 at a price of $7.00 per share.

5.   In the past three years, Plaintiff has not sought to serve as a representative party for a class in an action filed under the federal securities laws.

6.  Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 19 day of October, 2018.

_____
PANTHER PARTNERS INC.