UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

PANTHER PARTNERS INC., Individually
and on Behalf of All Others Similarly Situated,

                      Plaintiff,

    vs.

JIANPU TECHNOLOGY INC., DAQING
(DAVID) YE, YILU (OSCAR) CHEN,
JIAYAN LU, CAOFENG LIU, CHENCHAO
ZHUANG, JAMES QUN MI, KUI ZHOU,
YUANYUAN FAN, DENNY LEE, RONG360
INC., GOLDMAN SACHS (ASIA) L.L.C.,
GOLDMAN SACHS & CO. LLC, MORGAN
STANLEY & CO. INTERNATIONAL PLC,
J.P. MORGAN SECURITIES LLC, CHINA
RENAISSANCE SECURITIES (HONG
KONG) LIMITED, CHINA RENAISSANCE
SECURITIES (US) INC., LAW DEBENTURE
CORPORATE SERVICES INC., and
GISELLE MANON inclusive,

                      Defendants.

——————————————————————— x

Civil Action No. 1:18-cv-09848 (PGG)

CLASS ACTION

AMENDED COMPLAINT FOR
VIOLATIONS OF THE SECURITIES ACT
OF 1933

DEMAND FOR JURY TRIAL

Lead Plaintiff Panther Partners Inc. ("Lead Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters based on the investigation undertaken by its counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Jianpu Technology Inc. ("Jianpu" or the "Company"), as well as securities analyst reports and advisories about the Company, press releases, media reports, and other information by or about the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all those who purchased or otherwise acquired the American Depositary Shares ("ADSs") of Jianpu in connection with its November 16, 2017 initial public offering (the "IPO"), pursuant and/or traceable to the prospectus (the "Prospectus") and Forms F-1 and F-6 registration statements, as amended (together with the Prospectus, the "Registration Statement"), seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

2. Defendant Jianpu operates an independent online platform in the People's Republic of China (the "PRC" or "China") that recommends, and enables users to discover, financial products including loans and credit cards. The Company utilizes its proprietary technology to match users with appropriate financial products and to help financial service providers better target and serve users.

3. Jianpu generates revenues from the fees that it charges to financial service providers who utilize its platform. Specifically, financial service providers pay Jianpu a fee when a user completes a loan application or is issued a credit card. The Company's revenues from loan recommendation services are therefore dependent upon the number of loan applications completed

on its platform, and hence, on the number of financial service providers offering such loans.  At the time of the IPO, approximately 80% of Jianpu's revenues were attributable to loan recommendation services.

4.       As detailed below, the Registration Statement failed to disclose the extent to which Chinese laws and regulations posed a material risk to Jianpu's revenues from loan recommendation services.  First, the Registration Statement failed to disclose Jianpu's exposure to financial service providers that were subject to regulations in China governing "peer-to-peer" (or "P2P") lending, known as the Interim Measures – or that the Interim Measures were causing a decline in the number of P2P financial service providers operating in China at the time of the IPO.  Second, the Registration Statement failed to disclose that a material portion of the loans offered by financial service providers on Jianpu's platform featured annualized interest rates (also known as "APR") in excess of 36%, in violation of PRC laws and regulations.

5.       Indeed, at the time of the IPO, a material portion of the financial service providers offering loans on Jianpu's platform were failing to comply with applicable PRC laws and regulations, including licensing and custodial bank requirements imposed by the Interim Measures, as well as the 36% APR cap.  The Registration Statement, however, did not contain any discussion of these laws and regulations, or their applicability to the financial service providers that supplied the majority of Jianpu's revenue.

6.       Investors who purchased Jianpu ADSs in connection with the IPO were therefore unaware of the material risk that heightened regulatory enforcement of the Interim Measures or the 36% APR cap would either: (i) force financial service providers to stop offering certain loans; (ii) drive financial service providers from the market; (iii) cause Jianpu to remove certain loans from its platform; or (iv) cause Jianpu to terminate its relationships with financial service providers who

violated the Interim Measures or the 36% APR cap – any one of which would lead to a decrease in the number of loans offered, and loan applications completed, on Jianpu's platform, and thereby adversely impact Jianpu's revenues from loan recommendation services.

7.      Less than a month after the IPO, regulatory authorities in China introduced a series of measures designed to enhance governmental enforcement of both the Interim Measures and the 36% APR cap.  This heightened regulatory enforcement caused the growth in Jianpu's revenues from loan recommendation services to slow dramatically, beginning in the first quarter of 2018 – the first full quarter after the regulations took effect.

8.      Jianpu ultimately reported that, for 2018, its revenues from loan recommendation services decreased by 9.3% year-over-year ("y-o-y"), "primarily due to the decrease in the number of loan applications on the Company's platform" – in dramatic contrast to the 369% y-o-y increase that the Company had reported for 2017.

9.      The price of Jianpu ADSs declined in tandem with the Company's decline in revenue growth.  At the time of the filing of the initial complaint in this action, Jianpu ADSs traded at $4.75 per ADS – approximately 40% below the IPO price.

**JURISDICTION AND VENUE**

10.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

11.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

12.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §§1391(b) and (c).  The acts and conduct complained of herein occurred, in substantial part, in this District, as the IPO was marketed in this District.  In addition, Jianpu's agent for service of process in the U.S. is located in this District; the Underwriter Defendants (defined below) for the

IPO conduct substantial operations in this District; and the ADSs are listed and trade on the New York Stock Exchange ("NYSE"), a national stock market based in this District.

13.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14.     As set forth in its previously-filed Certification, incorporated by reference herein, Lead Plaintiff Panther Partners Inc. purchased Jianpu ADSs in and traceable to the Registration Statement for the IPO and has been damaged thereby.

15.     Defendant Jianpu is a Beijing-based holding company which, through its subsidiaries, operates an online platform that provides users with research and recommendations on financial products in China.  It provides users with personalized search results and recommendations tailored to their financial needs and credit profile, and furnishes tailored data, risk management and end-to-end solutions to financial service providers to allow them to reach and serve their target customers more effectively through online and mobile channels.  The Company's ADSs trade on the NYSE under the ticker symbol "JT," with two ADSs representing five Class A ordinary shares of the Company.

16.     Defendant Daqing (David) Ye ("Ye"), a Jianpu co-founder, served as Chairman of the Company's Board of Directors and as its Chief Executive Officer at the time of the IPO.  Ye reviewed, contributed to, and signed the Registration Statement.  He also signed certain documents comprising the Registration Statement as "attorney-in-fact" for defendants Jiayan Lu ("Lu"), Caofeng Liu ("Liu"), Chenchao Zhuang ("Zhuang"), James Qun Mi ("Mi"), Kui Zhou ("Zhou"), and Yuanyuan Fan ("Fan"), each of whom served as a director of the Company before the IPO and personally signed the Form F-1 registration statement, dated and filed with the SEC on October 20,

- 4 -

2017, and the Form F-6 registration statement, dated November 3, 2017 and filed with the SEC on November 6, 2017.

> (a)      Specifically, the October 20, 2017 Form F-1 registration statement contained a Power of Attorney, which vested authority in defendants Ye and Yilu (Oscar) Chen ("Chen"), the Company's Chief Financial Officer ("CFO"), to sign as "attorney-in-fact" on behalf of these directors (Lu, Liu, Zhuang, Mi, Zhou and Fan) the other materials that, with the October 13, 2017 Form F-1 registration statement, constitute the Registration Statement.

> (b)      Likewise, the November 3, 2017 Form F-6 registration statement contained a Power of Attorney, which vested authority in defendants Ye and Chen to sign as "attorney-in-fact" on behalf of these directors (Lu, Liu, Zhuang, Mi, Zhou and Fan) the other materials that, with the November 3, 2017 Form F-6 registration statement, constitute the Registration Statement.

17.      Defendant Chen served as CFO of the Company at the time of the IPO.  He reviewed, contributed to, and signed the Registration Statement.  As indicated in the October 20, 2017 Form F-1 registration statement, Chen, together with defendant Ye, possessed the authority to sign certain documents comprising the Registration Statement as "attorney-in-fact" for defendants Lu, Liu, Zhuang, Mi, Zhou and Fan.

18.      Defendants Lu, Liu, Zhuang, Mi, Zhou, and Fan each served as a director of the Company at the time of the IPO.  As alleged herein, they each reviewed, contributed to, and signed and/or authorized signing the Registration Statement.  Specifically, they personally signed the October 20, 2017 Form F-1 and November 3, 2017 Form F-6 registration statements, and authorized their signatures on the other materials comprising the Registration Statement.

19.      Defendant Denny Lee ("Lee") served as a director of the Company at the time of the IPO.  The Registration Statement identified Lee as a director of the Company effective upon the

SEC's declaration of effectiveness of the Form F-1 registration statement and indicated that he had accepted his appointment as a director, subjecting him to liability under the Securities Act to purchasers of the ADSs in connection with the IPO.

20.     Defendant Giselle Manon ("Manon"), at all relevant times, was Jianpu's authorized U.S. representative in connection with her position as Service of Process Officer for defendant Law Debenture Corporate Services Inc. ("Law Debenture").  Manon signed the Registration Statement in New York, New York, and presumably also reviewed and contributed to the Registration Statement as a signatory thereto.  Unless the context herein dictates otherwise, Manon and the other individual defendants referenced above are collectively referred to herein as the "Individual Defendants."

21.     Defendant Law Debenture is a New York corporation whose principal executive office is located at 400 Madison Avenue, 4th Floor, New York, New York 10017, and whose address for service of process on behalf of Jianpu is identified in the Prospectus as 801 2nd Avenue, Suite 403, New York, New York 10017.  Law Debenture caused Manon to sign the Registration Statement in New York on behalf of Jianpu.  Jianpu designated Law Debenture as its agent upon whom process may be served in any action in New York brought against it under the securities laws of the U.S.

22.     Defendant Rong360 Inc. ("Rong360") is Jianpu's parent company.  Before the IPO, Rong360 beneficially owned 100% of Jianpu's issued Class B ordinary shares, each of which carried with it ten votes and was convertible at the election of its holder into one Class A ordinary share entitled to one vote.  After the IPO, Rong360's Class B share ownership interest equated to 83.4% of Jianpu's total issued and outstanding share capital, but Rong360 held 98% of the Company's voting rights.  As a result, at all relevant times, Rong360 controlled Jianpu.  In fact, after the IPO, Jianpu qualified as a "controlled company" as defined under the NYSE Listed Company Manual because of

Rong360's greater-than-50% voting interest in the Company.  An issuer is a "controlled company" under the NYSE Listed Company Manual if more than 50% of the voting power for the election of directors is held by a person, entity or group.

23.    Defendants Goldman Sachs (Asia) L.L.C. ("Goldman Sachs"), Morgan Stanley & Co. International plc, J.P. Morgan Securities LLC and China Renaissance Securities (Hong Kong) Limited ("China Renaissance") served as joint bookrunners of the IPO and representatives of the underwriters.  Collectively, they received commissions and other professional fees of approximately $12.6 million in connection with the IPO.  Additionally, according to the Prospectus, they received the following allotment of ADSs in connection with the IPO:

| Underwriters | Number of ADSs |
|---|---|
| Goldman Sachs (Asia) L.L.C. | 9,450,000 |
| Morgan Stanley & Co. International plc | 9,450,000 |
| J.P. Morgan Securities LLC | 2,812,500 |
| China Renaissance Securities (Hong Kong) Limited | 787,500 |
| **Total** | 22,500,000 |

24.    Defendant Goldman Sachs & Co. LLC ("GS&C") is a New York limited liability company whose principal executive office is located at 200 West Street, New York, New York 10282.  GS&C is Goldman Sachs' SEC-registered broker-dealer affiliate in the U.S.  The Prospectus represented that Goldman Sachs offered ADSs for sale in the U.S. through GS&C, and, upon information and belief, GS&C did offer the ADSs for sale in the U.S.  Accordingly, GS&C acted as an underwriter of the ADSs and is liable under the Securities Act in the same manner and to the same extent as the other underwriters, including Goldman Sachs.

25.    Defendant China Renaissance Securities (US) Inc. ("CRSI") is a New York corporation whose principal executive office is located at 600 Fifth Avenue, 21st Floor, New York, New York 10020.  CRSI is China Renaissance's SEC-registered broker-dealer affiliate in the U.S.  The Prospectus represented that China Renaissance offered ADSs for sale in the U.S. through CRSI,

and, upon information and belief, CRSI did offer the ADSs for sale in the U.S.  Accordingly, CRSI acted as an underwriter of the ADSs and is liable under the Securities Act in the same manner and to the same extent as the other underwriters, including China Renaissance.

26.     The underwriters identified above, including GS&C and CRSI, are collectively referred to herein as the "Underwriter Defendants."  The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement and failed to perform adequate due diligence in connection with their roles as underwriters.  As a result, they were negligent in failing to ensure that the Registration Statement was prepared accurately and in accordance with the rules and regulations governing its preparation.  Additionally, they participated in preparing road show and other materials used to solicit ADS purchasers in connection with the IPO, including, but not limited to, a written November 2017 presentation prepared in English and entitled "Roadshow Presentation."

27.     Unless otherwise noted, Jianpu, the Individual Defendants, Law Debenture, Rong 360 and the Underwriter Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

28.     Defendant Jianpu operates an online platform under the brand name "Rong360" in the PRC.  The Company's platform functions as a marketplace, connecting users with financial service providers by: (i) allowing users to access information on loan, credit card, and wealth management products; (ii) recommending loans and credit cards to individual users; and (iii) assisting financial service providers in targeting users with specific financial needs or credit profile characteristics.  To a lesser extent, Jianpu also provides advertising, marketing, and data risk management solutions to financial service providers.

29.     The Company's revenues are primarily generated from fees charged to financial service providers for recommendation services offered on Jianpu's platform.  Jianpu charges

financial service providers on a "cost-per-action" basis for loan products (based upon the completion of a loan application) and on a "cost-per-success" basis for credit card products (based upon the issuance of a credit card).

30.     At the time of the IPO, loan recommendation services were the primary driver of Jianpu's revenues.  During the first half of 2017, Jianpu generated nearly 80% of its revenues from loan recommendation services, approximately 12% from credit card recommendation services, and approximately 8% from advertising, marketing and other services.

31.     Since its founding in 2011, Jianpu's revenues have grown substantially – driven by the rapid growth of online consumer lending in China, and in turn, increases in the number of monthly active users and the number of loan applications completed on the Company's platform.  At the time of the IPO, Jianpu reported 67 million registered users on its platform, as well as 2,500 financial service providers offering 170,000 financial products.

**The IPO**

32.     Seeking to raise capital from the public by listing its shares on a U.S. exchange, Jianpu, with the assistance of the other defendants, conducted a lucrative IPO.

33.     On October 20, 2017, Jianpu filed with the SEC a draft registration statement on Form F-1, which was followed by a Form F-6 registration statement filed on November 6, 2017 to register the ADSs.  Following amendments on November 3, 2017 and November 13, 2017, the SEC declared the Registration Statement effective on November 15, 2017.

34.     On November 17, 2017, Jianpu filed with the SEC the Prospectus for the IPO on Form 424B, which incorporated and formed part of the Registration Statement.  The Prospectus offered to sell to the public 22.5 million ADSs (excluding the underwriters' option to purchase an additional 3.375 million ADSs) at a price of $8.00 per ADS.

35.     Jianpu sold 22.5 million ADSs in the IPO, raising approximately $164.9 million in proceeds, net of underwriting discounts and commissions and other offering expenses.  Following the IPO, Jianpu ADSs were listed and traded on the NYSE under the symbol "JT."

36.     The Registration Statement was negligently prepared, and as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements therein not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

37.     Specifically, the Registration Statement failed to disclose the extent to which existing regulations in China – as well as the risk of heightened regulatory enforcement – threatened Jinapu's revenues from loan recommendation services – the source of 80% of its revenues at the time of the IPO.

### At the Time of the IPO, Increased Regulation Was Leading to a Decline in the Number of P2P Companies Operating in China

38.     First, the Registration Statement failed to disclose Jianpu's exposure to financial service providers that were subject to regulations in China governing P2P lending, or that those regulations were causing a decline in the number of P2P financial service providers at the time of the IPO.

39.     The Registration Statement did not disclose that a material portion of the financial service providers offering loans on Jianpu's platform were P2P lending companies that had been the target of regulatory scrutiny since at least August 2016.  At the time of the IPO, regulations designed to reign-in the P2P lending industry had led to an ongoing decline in the number of P2P companies operating in China – thereby jeopardizing Jianpu's loan recommendation revenues from this significant category of financial service providers.

40.     Online lending in China experienced explosive growth in the years prior to the IPO, beginning with the development of P2P lending.  P2P companies function as online lending intermediaries, enabling borrowers and lenders to bypass traditional financial intermediaries to execute transactions.

41.     Since P2P companies operate predominantly online and have lower overhead, lenders can earn higher returns compared to savings and investment products offered by traditional banking institutions.  That, coupled with many small Chinese borrowers being crowded out of the formal lending system by big corporations, allowed China to quickly become the largest P2P market in the world.  The rapid growth of P2P loans in China, many of which are small, unsecured and short-term in nature, also led to a sharp rise in fraudulent lending activity.

42.     Prompted by a series of scandals involving fraudulent P2P lending companies, in August 2016, the China Banking Regulatory Commission (the "CBRC"), along with three other Chinese regulatory authorities, jointly issued the Interim Measures on Administration of Business Activities of Online Lending Information Intermediaries (the "Interim Measures"), which established the regulatory framework for online P2P companies in China.

43.     Among other things, the Interim Measures: (i) prohibited P2P companies from engaging in 13 enumerated activities, including raising funds and guaranteeing loans; (ii) capped the amounts that P2P companies could lend to individuals and entities; (iii) required P2P companies to register with their local financial regulatory authority and obtain a telecommunications business operating license; and (iv) required P2P companies to place investors' funds in escrow accounts at a qualified custodial bank.

44.     The Interim Measures were followed by a series of implementation rules further clarifying the regulatory requirements for P2P companies:

- In October 2016, regulators issued rules regarding the informational disclosures P2P companies must make.

- In November 2016, the CBRC and other regulators jointly issued guidelines on online lending registration, providing details about the registration process and requirements for supporting documentation.

- In February 2017, the CBRC issued guidelines on the custodial bank requirement, clarifying that only commercial banks could provide fund custodian services for P2P companies and each P2P company could only hire one custodian.

- In June 2017, regulators issued a notice to stop illegal cooperation between P2P platforms and private financial asset exchanges – following concerns that some had cooperated to circumvent the rules on the borrowing amount cap.

- In August 2017, the CBRC issued additional guidelines clarifying the disclosure requirements for online P2P lenders.

45. By raising the regulatory barriers for P2P companies to operate in China, the Interim Measures were widely expected to lead to an exodus of P2P companies from the online consumer finance market.

46. According to a January 2017 report by "P2P001," a Shenzhen-based financial web portal, the growth rate of the P2P industry in 2016 had slowed to approximately half of the growth rate in 2014 and 2015 because of the Interim Measures and concerns over new P2P regulations. According to the report, by the end of 2016, only 184 P2P companies – less than 8% of the 2,307 financially-viable P2P companies operating in China – were compliant with the Interim Measures' requirement that investors' funds be placed in escrow accounts at a qualified custodial bank. And, only 424 of those companies held telecommunication business operating licenses, as required by the Interim Measures. Deng Jianpeng, vice president of the Chinese Internet Financial Innovation Research Institute, commented at the time that: "The current regulations increased the operating

costs of P2P lending platforms.  *A large number of them will possibly vanish in the next two or three years*." [1]

47.     Similarly, on January 8, 2017, *The Epoch Times*, an independent, global news source focused on uncensored China news, reported that "*[o]nly* 200 P2P lenders – *a fraction of the P2P industry* which is believed to have between 2,500 to 3,000 total lenders – *are expected to pass the regulatory review process and remain viable by next year*[.]"

48.     In addition, on February 19, 2017, the *South China Morning Post*, Hong Kong's newspaper of record, reported that Chinese regulators had "*warn[ed] that 90 [percent] of peer-to-peer lenders could fail in 2017*."  The article cited a multi-agency report led by the Beijing Bureau of Financial Work predicting that "*[n]ine out of 10 of the mainland's peer-to-peer (P2P) lending platforms will struggle to survive this year as the government rolls out tightened regulatory supervisions*[.]"

49.     In July 2017, Hongling Capital, one of the largest P2P companies in China, announced its exit from the industry, citing the Interim Measures' cap on borrowing amounts as hampering the growth of its corporate loan-focused business.

50.     As predicted, the number of P2P companies operating in China declined markedly following the Interim Measures, falling from approximately 3,500 at the end of 2015 to less than 2,000 as of October 2017 – the month prior to Jianpu's IPO.

---

[1]     All emphasis is added unless otherwise noted.

Figure 14: Number of P2P platforms in normal operation continues to decline

Source: Wangdaizhijia

**Prior to the IPO, Most Loans Offered on Jianpu's Platform
Featured Annualized Interest Rates in Excess of the 36% Cap
Imposed by PRC Laws and Regulations**

51.     Second, the Registration Statement failed to disclose that a material portion of the

loans offered by financial service providers on Jianpu's platform featured annualized interest rates

(*i.e*., APR) in excess of 36%, in violation of PRC laws and regulations.

52.     Due in part to the borrowing cap imposed by the Interim Measures, some P2P

companies shifted their business model to offering "micro-loans," also known as "cash loans" or

"payday loans."  Micro-loans are small, short-term unsecured consumer loans, often without a stated

borrowing purpose, featuring high interest rates and fees.

53.     Pursuant to an August 2015 ruling by the Supreme People's Court, the highest court

in China, if the interest rate – including penalties and fees – of a loan contract is higher than 36%,

the excess interest exceeding 36% is unenforceable and legally invalid.  Loans with rates over 24%,

but below 36%, are valid but unenforceable.

54.     In contravention of this law, many micro-lenders began to offer consumer loans with

usurious interest rates, often disguising the true interest rate by charging opaque fees.  Following

media reports of borrowers being confronted with intimidating collection practices and committing suicide to escape their debts, Chinese regulators began to crack down on these loans, as well.

55.     In April 2017, the CBRC, together with other regulators, issued regulations for cash loans, applicable to both P2P and micro-loan companies.  Among other things, the regulations provided that the prohibition on annualized interest rates and fees in excess of 36% should be strictly enforced, and that regulators and local authorities should pay particular attention to lenders of cash loans with annualized interest rates above the 36% cap and with excessive fees that drive up the true interest rate.

56.     Soon after the IPO, analysts reported that the majority of loans offered by financial service providers on Jianpu's platform featured annualized interest rates in excess of 36%. According to a December 20, 2017 J.P. Morgan analyst report initiating coverage of Jianpu, as of October 25, 2017 – shortly before the IPO – "***most***" loan products offered on Jianpu's platform featured annualized interest rates ***greater than 36%***, and as high as 540%.  Citing Company data, the report also stated that as of December 15, 2017 – one month after the IPO, following additional regulations designed to step up enforcement the 36% APR cap – "most products" with annualized interest rates greater than 36% had "been delisted" from Jianpu's platform.

### The Registration Statement Contained Inaccurate Statements of Material Fact and Omitted Material Facts Necessary to Make the Statements Therein Not Misleading

57.     The Registration Statement contained only a single, undefined reference to P2P companies in connection with describing the general composition of the consumer finance market in China:

> ***As at December 31, 2016, there were*** 2,459 banks, 8,673 traditional micro loan companies, 78 internet micro loan companies, 21 consumer finance companies, ***2,090 P2P companies*** and 68 trust companies and 7,898 financial guarantee companies ***in China servicing the consumer finance market***.

58.     Similarly, in describing Jianpu's "[e]xtensive and diversified network of financial service providers," the Registration Statement did not contain any mention of P2P companies:

> We have attracted a large and diversified group of financial service providers in China to our platform. In the first nine months of 2017, we worked with a total of over 2,500 financial service providers, including 257 banks, 21 credit card issuers, **10 consumer finance companies, 310 micro-loan companies and other licensed financial institutions and 746 emerging technology-enabled financial service providers and a variety of local financial service providers, offering a wide variety of financial products across a broad credit spectrum**.

59.     The statements referenced above in ¶¶57-58 negligently failed to disclose that: (i) a material portion of the financial service providers offering loans on Jianpu's platform were P2P companies subject to detailed regulations set forth in the August 2016 Interim Measures; (ii) at the time of the IPO, the regulatory hurdles imposed by the Interim Measures had led to an ongoing decline in the number of P2P companies operating in China; and (iii) this decline was reasonably likely to have a material, adverse effect on Jianpu's revenues from loan recommendation services.

60.     In addition, the statement referenced above in ¶58 highlighting the "wide variety of financial products across a broad credit spectrum" offered on Jianpu's platform negligently failed to disclose that: (i) PRC laws and regulations prohibited loans with annualized interest rates and fees in excess of 36%; (ii) a material portion of the "wide variety of financial products across a broad credit spectrum" offered on Jianpu's platform were loans that violated the 36% APR cap; and (iii) there was a material risk that heightened regulatory enforcement of the 36% APR cap would lead to a decrease in the number of loans offered, and loan applications completed, on Jianpu's platform, and thereby adversely impact Jianpu's revenues from loan recommendation services.

61.     Without explicitly mentioning micro-lending or cash loans, the Registration Statement represented that Jianpu had benefited from the recent trend in favor of smaller loans of shorter duration, as financial service providers "extend[ed] credit to previously underserved segments of the market," stating in pertinent part:

We record fees charged for our recommendation services for loan products on a cost-per-action basis, where the action is generally determined by a user's completion of a loan application. ***In recent years, the average loan size and the average loan duration on our platform have both decreased as financial technology has made it more cost effective for financial service providers to extend credit to previously underserved segments of the market. Generally speaking, we benefit from a trend towards smaller and shorter duration loans to the extent that they result in larger numbers of loans being taken out more frequently***.

62.     The Registration Statement represented that "approximately . . . ***91.0%***" of the loan applications submitted by users on Jianpu's platform in 2016 "were consumer loan applications," which provided borrowers with financing for "a wide variety of personal needs such as home decorations, weddings, travel, major appliances and other personal expenses," and highlighted the increasing "demand for consumer loans." The Registration Statement further stated that "a ***broad range of financial service providers***, including . . . emerging technology-enabled financial service providers, offer[ed] consumer loan products through [Jianpu's] platform, addressing a wide range of financial needs ***across the credit spectrum***."

63.     The Registration Statement also represented that "[c]onsumer loan products ***can vary greatly by terms***, targeted borrowers and approval conditions," and disclosed the typical length and principal amounts of such loans offered on Jianpu's platform, stating that: "[c]onsumer loan products on our platform generally have terms ranging from one month to three years and principal amounts of between RMB 1,200 (US$177) and RMB 334,000 (US$49,268)." However, the Registration Statement did not disclose the typical annualized interest rates of the consumer loans offered on Jianpu's platform, or that most of these loans featured APR in excess of 36%.

64.     The statements referenced above in ¶¶61-63 negligently failed to disclose that: (i) PRC laws and regulations prohibited loans with annualized interest rates and fees in excess of 36%; (ii) many – if not most – of these "smaller and shorter duration loans" and "consumer loan products" offered "across the credit spectrum" featured annualized interest rates and fees in excess

of the 36% APR cap; and (iii) there was a material risk that heightened regulatory enforcement of the 36% APR cap would lead to a decrease in the number of loans offered, and loan applications completed, on Jianpu's platform, and thereby adversely impact Jianpu's revenues from loan recommendation services.

65.     In addition, the statement referenced above in ¶62 that a "broad range of financial service providers . . . offer[ed] consumer loan products through [Jianpu's] platform" negligently failed to disclose that: (i) a material portion of the financial service providers offering loans on Jianpu's platform were P2P companies subject to detailed regulations set forth in the August 2016 Interim Measures; (ii) at the time of the IPO, the regulatory hurdles imposed by the Interim Measures had led to an ongoing decline in the number of P2P companies operating in China; and (iii) this decline was reasonably likely to have a material, adverse effect on Jianpu's revenues from loan recommendation services.

66.     The Registration Statement highlighted the "***proliferation of new financial service providers***" and the "***favorable regulatory environment***" as "key drivers for growth" in the online consumer finance market in China.

67.     The foregoing statement was an inaccurate statement of material fact because it negligently failed to disclose the presently-existing regulations applicable to the financial service providers offering loans on Jianpu's platform – namely, the Interim Measures and the 36% APR cap – which did not create a "favorable regulatory environment."   The foregoing statement also negligently failed to disclose the decline in the number of P2P companies operating in China as a result of the Interim Measures – a significant trend cutting against the "proliferation of new financial service providers."

68.     The Registration Statement negligently omitted any discussion of the presently-existing regulations applicable to the financial service providers offering loans on Jianpu's platform, instead vaguely describing the "[r]egulatory environment in China" as "rapidly evolving" and "unclear," stating in pertinent part:

Regulatory environment in China

***The PRC government has not adopted a clear regulatory framework governing the young and rapidly evolving online consumer finance market, and we expect that the regulatory framework will remain unclear for some time to come****.*

69.     The statements referenced above in ¶68 was an inaccurate statement of material fact because it negligently failed to disclose that "[t]he PRC government" **had** "adopted a clear regulatory framework governing the . . . online consumer finance market" – in the form of the Interim Measures and the 36% APR cap.

70.     The Registration Statement negligently made reference to hypothetical risks associated with the regulatory environment in China when, in fact, such risks were existing, stating that "***[i]f*** the PRC government adopts stringent regulations on financial service providers in the online consumer finance market, the growth of that market **may** slow, which **may** limit our growth."

71.     The purported risk disclosure referenced above in ¶70 negligently failed to disclose that: (i) "the PRC government" **had** "adopt[ed] stringent regulations [for] financial service providers in the online consumer finance market" – in the form of the Interim Measures and the 36% APR cap; and (ii) there was a material risk that heightened regulatory enforcement of the Interim Measures or the 36% APR cap would lead to a decrease in the number of loans offered, and loan applications completed, on Jianpu's platform, and thereby adversely impact Jianpu's revenues from loan recommendation services.

72.     Likewise, the Registration Statement cited "[r]egulatory uncertainties relating to online consumer finance in China" as a risk factor, stating in pertinent part:

> Our business or ***the businesses of our financial service providers may be subject to a variety of PRC laws and regulations governing financial services***.  The application and interpretation of these laws and regulations are ambiguous and may be interpreted and applied inconsistently between different government authorities. In particular, ***the PRC government has not adopted a clear regulatory framework governing the new and rapidly-evolving online consumer finance market, which is the source of the transactions that our platform facilitates***.  As of the date of this prospectus, we have not been subject to any material fines or other penalties under any PRC laws or regulations on our business operations.  ***The PRC government may adopt a stringent regulatory framework for the online and mobile consumer finance market in the future, and impose specific requirements (including licensing requirements) on market participants***.  The PRC government may also enhance the implementation of existing laws and regulations.

73.     The purported risk disclosure referenced above in ¶72 negligently omitted the material fact that the financial service providers offering loans on Jianpu's platform were ***already*** "subject to a variety of PRC laws and regulations governing financial services," including the Interim Measures and the 36% APR cap.  It likewise negligently failed to disclose that the PRC government ***had*** adopted a "clear regulatory framework governing" P2P companies, with the adoption of the Interim Measures in August 2016, which ***did*** "impose specific requirements (including licensing requirements) on" P2P companies, and which had, by the time of the IPO, led to an ongoing decline in the number of P2P companies operating in China.

74.     The Registration Statement also referred to "media speculation" surrounding potential new regulations, but negligently omitted any discussion of existing regulations or their likely impact, stating in pertinent part:

> There has been media speculation that the PRC government may, among other things, (i) ***impose new regulations on fees and interest charged by financial service providers***, (ii) ***introduce licensing requirements for online lenders***, (iii) close down unlicensed financial service providers that take deposits from consumers and (iv) close down financial service providers that engage in illegal collection practices.  A significant number of financial service providers on our platform operate in the online and mobile consumer finance market.  Consequently, new government laws and regulations, stricter enforcement of existing laws and regulations or even speculation regarding such developments may materially and adversely affect our business, financial condition and prospects.

75.     The purported risk disclosure referenced above in ¶74 negligently omitted the material fact that *existing* PRC "government laws and regulations" *already* imposed: (i) restrictions "on fees and interest charged by financial service providers" – capping such fees and interest at 36% APR; and (ii) "licensing requirements for online [P2P] lenders[.]"  It also negligently failed to disclose that a majority of the loans offered on Jianpu's platform featured annualized interest rates in excess of 36%, and that only a fraction of P2P companies were currently in compliance with the licensing and custodial bank requirements imposed by the Interim Measures – and therefore "stricter enforcement of existing laws and regulations" would almost certainly "materially and adversely affect [Jianpu's] business, financial condition and prospects."

76.     The Registration Statement referred to the *potential* risk that "*[i]f* any of our financial service providers is deemed to violate any PRC laws or regulations, . . . [w]e *may* have to remove financial products from our platform or terminate [our] relationship[s] with financial service providers" – when in fact, such a risk was presently existing.  The Registration Statement further cautioned that "if any financial product on our platform is deemed to violate any laws, rules or regulations, we may face, among others, regulatory warnings, correction orders, condemnation, fines and criminal liability.  As a result, our business, reputation, financial performance and prospects could be materially and adversely affected."

77.     The purported risk disclosure referenced above in ¶76 negligently omitted the material fact that a significant portion of the financial service providers offering loans on Jianpu's platform were *presently* failing to comply with applicable PRC laws and regulations, including the licensing and custodial bank requirements imposed by the Interim Measures, and the 36% APR cap. In addition, it discussed the potential consequences for Jianpu of hosting non-compliant financial products and financial service providers on its platform, such as "regulatory warnings, correction

orders, condemnation, fines and criminal liability," but negligently failed to warn of the more imminent, material risk that "hav[ing] to remove financial products from [Jianpu's] platform or terminate [its] relationship[s] with financial service providers" would lead to a decrease in the number of loans offered, and loan applications completed, on Jianpu's platform, and thereby adversely impact Jianpu's revenues from loan recommendation services.

78.    The Registration Statement highlighted that Jianpu's total revenues for the third quarter of 2017 had increased by ***384%*** y-o-y.  This substantial increase in revenues was driven by the Company's revenues from loan recommendation services, which according to the Registration Statement, had increased from RMB 65,318 for the third quarter of 2016, to RMB 376,631 for the third quarter of 2017 – representing a y-o-y increase of more than ***476%***.

79.    The Registration Statement also emphasized the substantial y-o-y growth in the number of loan applications on Jianpu's platform, as follows:



80.    The Registration Statement likewise stated that "[t]he number of loan applications submitted through our platform has continued to grow in 2017, reaching almost 28.2 million in just the third quarter alone."

81.    The statements referenced above in ¶¶78-80 negligently failed to disclose that: (i) a material portion of the financial service providers offering loans on Jianpu's platform were P2P companies subject to detailed regulations set forth in the August 2016 Interim Measures; (ii) at the time of the IPO, the regulatory hurdles imposed by the Interim Measures had led to an ongoing

decline in the number of P2P companies operating in China; and (iii) this decline was reasonably likely to have a material, adverse effect on Jianpu's revenues from loan recommendation services. In addition, the statements referenced above in ¶¶78-80 negligently failed to disclose that: (i) a material portion of the financial service providers offering loans on Jianpu's platform were presently failing to comply with applicable PRC laws and regulations, including the licensing and custodial bank requirements imposed by the Interim Measures, and the 36% APR cap; and (ii) there was a material risk that heightened regulatory enforcement of the Interim Measures or the 36% APR cap would lead to a decrease in the number of loans offered, and loan applications completed, on Jianpu's platform, and thereby adversely impact Jianpu's revenues from loan recommendation services.

### The Registration Statement Omitted Material Information Required to Be Disclosed Therein

82.     As detailed herein, Jianpu filed a registration statement on Form F-1 (as amended), for the IPO.  Part I of Form F-1, entitled "Information Required in Prospectus," governs the nature and content of information an issuer must disclose in connection with an offering, such as the IPO. Item 4 of Part I, entitled "Information with Respect to the Registrant and the Offering," requires, in subpart (a) thereof, disclosure of the "[i]nformation required by Part I of Form 20-F."

83.     In turn, Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods*."  (Emphasis in original).  Specifically, Item 5(D), entitled "Trend information," provides, in full, as follows:

> The company should identify the most significant recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. ***The company also should discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are***

*reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition*.

84.     The scope of the information whose disclosure is required under this paragraph on trends, uncertainties and events is coextensive with that required under Item 303(a)(3)(ii) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

85.     In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *         *         *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

86.     The 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)     Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

87.     Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F."  In particular, the SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release as support and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – i.e., reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.

88.     Furthermore, in adopting amendments in 2003 to its rules to require disclosure of off-balance sheet arrangements for domestic and foreign issuers, the SEC reasoned that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies."  Because the Form F-1 expressly incorporated the MD&A requirements from Form 20-F, and those requirements are the same as for domestic issuers, the Registration Statement was required to disclose trends and uncertainties contemplated by Item 303(a) of Regulation S-K.

89.     Accordingly, Jianpu had an affirmative obligation to disclose in the Registration Statement information required by Item 303 of Regulation S-K.

90.     The Registration Statement, however, omitted material facts required to be stated therein because it negligently failed to disclose information regarding the following known trends, events or uncertainties: (i) a material portion of the financial service providers offering loans on Jianpu's platform were P2P companies subject to detailed regulations set forth in the August 2016

Interim Measures; (ii) at the time of the IPO, the regulatory hurdles imposed by the Interim Measures had led to an ongoing decline in the number of P2P companies operating in China; and (iii) this decline was reasonably likely to have a material, adverse effect on Jianpu's revenues from loan recommendation services.

91.     The Registration Statement also omitted material facts required to be stated therein because it negligently failed to disclose information regarding the following known trends, events or uncertainties: (i) a material portion of the financial service providers offering loans on Jianpu's platform were presently failing to comply with applicable PRC laws and regulations, including the licensing and custodial bank requirements imposed by the Interim Measures, and the 36% APR cap; and (ii) heightened regulatory enforcement of the Interim Measures or the 36% APR cap was reasonably likely to lead to a decrease in the number of loans offered, and loan applications completed, on Jianpu's platform, and thereby materially and adversely impact Jianpu's revenues from loan recommendation services.

92.     The Registration Statement similarly omitted material facts required to be stated therein because it negligently failed to disclose information on some of the most material risks facing Jianpu at the time of the IPO.  Item 503(c) of SEC Regulation S-K, 17 C.F.R. §229.503(c), which governs disclosure of risk factors, requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky." Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk." Item 3 of Part I of Form F-1 expressly requires a foreign private issuer, such as Jianpu, to "[f]urnish the information required by Item 503 of Regulation S-K (§229.503 of this chapter)."

93.     The Registration Statement omitted material facts required to be stated therein because it negligently failed to disclose the risks associated with the undisclosed trends, events or uncertainties identified above, as well as the risk that the favorable financial trends Jianpu was experiencing at the time of the IPO would reverse if those trends, events or uncertainties came to fruition.  The foregoing rendered the IPO significantly riskier than portrayed.  The absence of this information misled investors about the prospects and drawbacks of investing in Jianpu, as well as the true risk profile of the ADSs.

**Post-IPO Events**

94.     Less than a month after the IPO, Chinese authorities issued regulations designed to enhance governmental enforcement of both the Interim Measures (including their licensing requirements) and the 36% APR cap.

95.     On December 1, 2017, the National Internet Finance Rectification Office and the National Online Lending Rectification Office jointly issued a notice setting forth a host of regulations applicable to online micro-lenders and P2P companies offering micro-loans.  The regulations *prohibited* loans with interest rates above the 36% annualized interest rate cap, and clarified that the 36% cap was an "all-in" interest rate, including upfront fees billed to borrowers. The regulations also *prohibited* unlicensed organizations and individuals from conducting a lending business, and prohibited banks from providing funding to unlicensed lenders.

96.     The following week, on December 8, 2017, the National Online Lending Rectification Office issued a notice providing, among other things, that P2P companies *must comply with the Interim Measures* announced in August 2016 *in order to qualify for licensing*.  The notice established a timetable for compliance, whereby local authorities must complete inspections of P2P companies to assess their compliance by no later than June 2018.

97.     Following the IPO, analysts and investors scrambled to assess the impact that heightened regulatory enforcement of the Interim Measures and the 36% APR cap would have on Jianpu's business and prospects.

98.     On December 12, 2017, Jianpu held its first conference call following the IPO, to discuss its third quarter financial results.  During the call, Defendant Ye disclosed that "***non-licensed*** financial service providers, . . . including the P2P companies and also other non-licensed financial institutions" comprised "around 12% of [Jianpu's] total revenue in November."  Defendant Ye further admitted that "if these . . . non-licensed financial institutions cannot get their license . . . probably this . . . will . . . materially negatively impact[] [our] revenue down the road."

99.     During Jianpu's next conference call, held on March 5, 2018, to discuss its fourth quarter and full year 2017 financial results, a Goldman Sachs analyst asked Defendants to "talk through the revenue split between banks, . . . non-bank licensed [financial service providers] and the other ones in the fourth quarter and how has that change[d] since the regulatory changes put in place in the fourth quarter[.]"  In response, Defendant Chen responded that as much as ***60%*** of Jianpu's revenues currently came from non-bank financial service providers such as micro-lenders and P2P companies, and admitted that heightened regulatory scrutiny and enforcement would cause a decline in the portion of Jianpu's revenues generated from non-bank financial service providers.

100.    Analysts issued reports shortly after the IPO predicting that the heightened regulatory enforcement of the Interim Measures and the 36% APR cap announced in December 2017 would force many financial service providers from the market, thereby leading to a decrease in the number of loans offered, and loan applications completed, on Jianpu's platform that would adversely impact its revenues from loan recommendation services.  For example:

- A December 6, 2017 analyst report from Credit Suisse on the P2P industry warned that "the rising compliance cost and scrutiny [would] push many small players out of

the market[.]"  In particular, the licensing requirements for P2P companies would likely cause "[a] large portion of platforms [to] be filtered out," and "[t]he rate cap of 36% could significantly squeeze industry profitability as many players cannot break even at that rate."

- A December 14, 2017 Morgan Stanley analyst report initiating coverage of Jianpu cited "uncertainties with regard to [Jianpu's] near-term profitability amid heightened regulatory scrutiny on cash credit providers."  The report explained that "[w]ith stricter requirements on licensing that officially ban unlicensed/unregistered entities from engaging in lending business, qualified cash loan platforms could shrink to 300-400 firms, over time, we believe, from more than 2,000 currently[,]" and "the licensing and APR requirements will likely lead to a much lower supply of cash credit[.]"

- A December 20, 2017 J.P. Morgan analyst report initiating coverage of Jianpu predicted that enforcement of the 36% APR cap would cause micro-lenders, who charge high APR and fees "to cover high credit risks[,]" to be "forced out of business[,]" leading to a "*sharp decline [in] cash loans* originated by micro lenders[.]"  The report concluded that "[t]his *will pose [a] negative impact on Jianpu and lead to [a] sharp drop [in] their loan applications*."

101.  Enhanced enforcement of the Interim Measures and the 36% APR cap did in fact have a material, adverse effect on Jianpu's revenues from loan recommendation services – causing Jianpu to report a marked slow-down in growth, followed by a decline, in its revenues from loan recommendation services.

102.  Jianpu's revenues from loan recommendation services increased by *477%* y-o-y in the third quarter of 2017 (ended September 30), and increased by *429%* y-o-y in the fourth quarter of 2017 (ended December 31).  But, in the first quarter of 2018 (ended March 31) – the first full quarter after regulators stepped up enforcement of the Interim Measures and the 36% APR cap in December 2017 – the growth in Jianpu's revenues from loan recommendation services slowed dramatically, to an increase of just *46.5%* y-o-y.

103.  Indeed, in the Company's press release announcing its first quarter 2018 financial results, issued on May 29, 2018, Defendant Ye attributed Jianpu's "modest growth in loan recommendation services" to "*market adjustments within the new regulatory framework*[.]"

104.   This trend continued in the second quarter of 2018 (ended June 30), when Jianpu's revenues from loan recommendation services increased by just 42.9% y-o-y, and then **decreased** by 48.7% y-o-y in the third quarter of 2018, and **decreased** by 13.8% in the fourth quarter of 2018.

105.   In Jianpu's press release for the fourth quarter and full year 2018, the Company attributed the decrease in revenues from loan recommendation services in the fourth quarter in part to "***online lending market adjustments pertaining to the new regulatory framework since December 2017***," which had caused "the loan applications on the Company's platform [to] experience[] fluctuations in volume[.]"  Likewise, the press release reported a 9.3% y-o-y ***decrease*** in revenues from loan recommendation services for the full year 2018, "primarily due to the decrease in the number of loan applications on the Company's platform," which was attributable in part to "market adjustments within the new regulatory framework since December 2017[.]"

106.   In addition, the preexisting trend of a decline in the number of P2P companies operating in China continued during the year following Jianpu's November 2017 IPO:



Figure 1: Number of performing P2P platforms in China dropped to 1.18k in November

Source: WDZJ.com

107.   As of the filing of this action on October 25, 2018, Jianpu's ADSs traded at $4.75 per ADS – a decline of approximately 40% from the IPO price.

## CLASS ACTION ALLEGATIONS

108.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all purchasers of Jianpu ADSs pursuant and/or traceable to Company's IPO (the "Class").  Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

109.     The members of the Class are so numerous that joinder of all members is impracticable.  Jianpu ADSs are actively traded on the NYSE and 22.5 million ADSs were sold in the IPO.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be: (i) identified from records maintained by Jianpu or its transfer agent; (ii) notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions; and (iii) given an opportunity to exclude themselves from the Class.

110.     Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

111.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

112.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether the Registration Statement and Prospectus issued by Defendants to the investing public in connection with the IPO negligently omitted and/or misrepresented material facts about Jianpu and its business; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

113.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants Except Rong360

114.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against all Defendants except Rong360.  Lead Plaintiff does not claim that any of the defendants named in this Count engaged in intentional or reckless misconduct or acted with fraudulent intent.

116.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

117.     Jianpu was the registrant for the IPO.  As an issuer of securities to the public, Jianpu is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

118.     The Individual Defendants each signed the Registration Statement either personally or through an attorney-in-fact and/or caused its issuance.  Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading, and that the Registration Statement contained all facts required to be stated therein.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained material misstatements and/or omissions of material facts.  As such, the Individual Defendants are strictly liable to Lead Plaintiff and the Class.

119.     Additionally, Law Debenture is liable and responsible for Manon's act of signing the Registration Statement under the doctrine of respondeat superior.  Manon signed the Registration Statement at the direction and behest of her employer, Law Debenture, and as a consequence of doing so, she is subject to liability under the plain language of Section 11.  Further, Manon intended to and did sign the Registration Statement on behalf of Law Debenture, for which Law Debenture is directly liable and responsible.

120.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the IPO was prepared properly and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As such, the Underwriter Defendants are strictly liable to Lead Plaintiff and the Class.

121.     The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement.  None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained

in the Registration Statement were true and without omission of any material facts and/or were not misleading. By reason of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

122. Lead Plaintiff and the other members of the Class acquired Jianpu ADSs pursuant and/or traceable to the Registration Statement for the IPO and sustained damages when the price of Jianpu ADSs declined substantially subsequent to and due to Defendants' violations.

123. At the time of their purchases of Jianpu ADSs, Lead Plaintiff and the other members of the Class were without knowledge of the facts associated with the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to May 29, 2018. Less than one year has elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which this claim is based to the time that Lead Plaintiff commenced this action. Less than three years have elapsed between the time that the securities upon which this claim is brought were offered to the public and the time that Lead Plaintiff commenced this action.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants

124. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

125. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, against all Defendants. Lead Plaintiff does not claim that any of the defendants named in this Count engaged in intentional or reckless misconduct or acted with fraudulent intent.

126. Defendants named in this Count were sellers and offerors and/or solicitors of purchasers of the securities offered pursuant to the Registration Statement and Prospectus. Defendants issued, caused to be issued and/or signed the Registration Statement in connection with

the IPO.  The Registration Statement contained a Prospectus that was used to induce investors, such as Lead Plaintiff and the other members of the Class, to purchase the ADSs offered by Jianpu.

127.    The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit.  But for their participation in the IPO, including their solicitation as set forth herein, the IPO could not, and would not, have been accomplished.  Specifically, the Underwriter Defendants:

(a)    made the decision to conduct the IPO and do it at the price set forth in the Prospectus.  The Underwriter Defendants drafted, revised and/or approved the Prospectus and participated in its being declared effective by the SEC.  The Prospectus was calculated to create interest in Jianpu ADSs and was widely distributed by, or on behalf of, the Underwriter Defendants for that purpose; and

(b)    conceived and planned the IPO and orchestrated all activities necessary to affect the sale of Jianpu ADSs to the investing public by issuing, promoting and supervising the distribution and ultimate sale of Jianpu ADSs to the investing public.

128.    As set forth above, the Registration Statement and Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included preparing the defective and inaccurate Prospectus and participating in efforts to market the IPO to investors.

129.    Defendants owed the purchasers of Jianpu ADSs, including Lead Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus and to ensure that such statements were accurate and did not contain any misstatements or omissions of material fact.  Defendants, in the

exercise of reasonable care, should have known that the Registration Statement and Prospectus contained misstatements and omissions of material fact.

130.   Lead Plaintiff and the other members of the Class purchased or otherwise acquired Jianpu ADSs pursuant to the Registration Statement and Prospectus, and neither Lead Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Registration Statement and Prospectus.

131.   By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Lead Plaintiff, individually and on behalf of the Class, hereby offers to tender to Defendants those ADSs that Lead Plaintiff and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their ADSs are entitled to rescissory damages.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against Rong360, the Individual Defendants
### Other than Manon, and Law Debenture

132.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

133.   This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Rong360, the Individual Defendants other than Manon, and Law Debenture.  Lead Plaintiff does not claim that any of the defendants named in this Count engaged in intentional or reckless misconduct or acted with fraudulent intent.

134.   As detailed herein, each of the Defendants committed primary violations of the Securities Act, or are directly responsible and primarily liable for any such violations, by committing conduct in contravention of Sections 11 and 12(a)(2) or employing a violator.

135.   Rong360 and the Individual Defendants other than Manon acted as controlling persons of Jianpu within the meaning of Section 15 of the Securities Act.  By reason of their ownership interest, senior management positions and/or directorships at the Company, Rong360 and the Individual Defendants other than Manon individually, and acting pursuant to a common plan, had the power to influence and exercised the same to cause Jianpu to engage in the conduct complained of herein and were therefore control persons of Jianpu.  By reason of such conduct, Rong360 and the Individual Defendants other than Manon are liable pursuant to Section 15 of the Securities Act.

136.   Law Debenture, as Manon's employer, controlled Manon by virtue of their employment relationship.

137.   Rong360, each of the Individual Defendants other than Manon, and Law Debenture were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.   Determining this action to be a class action properly maintained pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative and designating Lead Counsel as Class Counsel;

B.   Awarding Lead Plaintiff and the other members of the Class damages together with interest thereon;

C.   With respect to Count II, ordering that the IPO be rescinded or awarding a rescissory measure of damages;

- 37 -

D.     Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this litigation, including attorneys' fees, accountants' and experts' fees, and other costs and disbursements; and

E.     Awarding Lead Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  March 28, 2019              ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                    SAMUEL H. RUDMAN
                                    DAVID A. ROSENFELD
                                    ERIN W. BOARDMAN

                                         */s/ Erin W. Boardman*
                                    ERIN W. BOARDMAN

                                    58 South Service Road, Suite 200
                                    Melville, NY  11747
                                    Telephone:  631/367-7100
                                    631/367-1173 (fax)
                                    srudman@rgrdlaw.com
                                    drosenfeld@rgrdlaw.com
                                    eboardman@rgrdlaw.com

                                    ABRAHAM FRUCHTER
                                      & TWERSKY, LLP
                                    JACK G. FRUCHTER
                                    TODD KAMMERMAN
                                    One Penn Plaza, Suite 2805
                                    New York, NY 10119
                                    Telephone: 212/279-5050
                                    212/279-3655 (fax)
                                    jfruchter@aftlaw.com
                                    tkammerman@aftlaw.com

                                    *Attorneys for Lead Plaintiff*