UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PANTHER PARTNERS INC., Individually
and on Behalf of All Others Similarly Situated,

                Plaintiff,

         vs

JIANPU TECHNOLOGY INC., DAQING
(DAVID) YE, YILU (OSCAR) CHEN,
JIAYAN LU, CAOFENG LIU, CHENCHAO
ZHUANG, JAMES QUN MI, KUI ZHOU,
YUANYUAN FAN, DENNY LEE, RONG360
INC., GOLDMAN SACHS (ASIA) L.L.C.,
GOLDMAN SACHS & CO. LLC, MORGAN
STANLEY & CO. INTERNATIONAL PLC,
J.P. MORGAN SECURITIES LLC, CHINA
RENAISSANCE SECURITIES (HONG
KONG) LIMITED, CHINA RENAISSANCE
SECURITIES (US) INC., LAW DEBENTURE
CORPORATE SERVICES INC., and GISELLE
MANON inclusive,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: 18 Civ. 9848 (PGG)

: **ECF CASE**
: **Electronically Filed**

: **Oral Argument Requested**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Scott D. Musoff
Robert A. Fumerton
Vincent M. Chiappini
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000

*Attorneys for Defendants Jianpu Technology
Inc., Rong360 Inc., Law Debenture Corporate
Services Inc., and Giselle Manon*

ROPES & GRAY LLP

David B. Hennes
Martin J. Crisp
Erin R. Macgowan
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-5000

*Attorneys for Defendants China Renaissance
Securities (Hong Kong) Limited, China
Renaissance Securities (US) Inc., Goldman Sachs
(Asia) L.L.C., Goldman Sachs & Co. LLC,
J.P. Morgan Securities LLC, and Morgan Stanley
& Co. International plc*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ........................................................................................................ 4

    A.     The Company and Its Business Model ........................................................... 4

    B.     The Regulatory Landscape in China ............................................................. 5

    C.     Jianpu's Disclosures ..................................................................................... 7

    D.     Post-IPO Regulations .................................................................................... 9

          1.     Annualized Interest Rate Cap of 36% ............................................. 9

          2.     Licensing Requirements ................................................................. 10

          3.     Impact ............................................................................................ 10

    E.     The Current Lawsuit .................................................................................... 11

ARGUMENT ........................................................................................................................ 11

I.     PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTIONS 11 OR 12(a)(2) ........ 11

    A.     Jianpu Did Not Fail to Disclose a Decline in the Number of "P2P" Lenders ....................................................................................................... 13

          1.     Jianpu Fully Disclosed Both the FSPs on Its Platform and the Regulations Affecting Them ........................................................ 13

          2.     Plaintiff Fails to Allege that the Purported Decline in the Number of "P2P" Lenders Before the IPO Was "Known" or "Material" .............. 16

    B.     Jianpu Adequately Disclosed the Regulatory Risk to Its Financial Performance ............................................................................................... 19

          1.     Jianpu Specifically Disclosed That Lenders on Its Platform Could Be Subject to Further Interest Rate and Licensing Requirements ............ 19

          2.     Lenders on Jianpu's Platform Were Not in Violation of Applicable Regulations Prior to the IPO ...................................................... 20

II.    PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BASED ON NEGATIVE CAUSATION ................................................................................................ 22

III.    PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY ............................25

CONCLUSION........................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995)............................................................................3, 22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................12

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...............................................................................4

*Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*,
  No. 07 Civ. 10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010)...................17, 22, 23, 24

*In re Britannia Bulk Holdings Inc. Securities Litigation*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009)..............................................................23

*In re Express Scripts Holdings Co. Securities Litigation*,
  No. 18-1850-cv, 2019 WL 2004302 (2d Cir. May 7, 2019).............................21

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009)...............16

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)........................................................................16, 23

*Hutchison v. Deutsche Bank Securities Inc.*,
  647 F.3d 479 (2d Cir. 2011)........................................................................18, 25

*In re Iconix Brand Group, Inc.*,
  No. 15 Civ. 4860(PGG), 2017 WL 4898228 (S.D.N.Y. Oct. 25, 2017)...........................12

*Indiana Public Retirement System v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)............................................................................17

*In re Jumei International Holding Ltd. Securities Litigation*,
  No. 14cv9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017)...............................1

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003)..............................................................23

*In re Morgan Stanley Information Fund Securities Litigation*,
  592 F.3d 347 (2d Cir. 2010)...........................................................................11

*In re Morgan Stanley Technology Fund Securities Litigation,*
 643 F. Supp. 2d 366 (S.D.N.Y. 2009), *aff'd,* 592 F.3d 347 (2d Cir. 2010) .......................12

*Nadoff v. Duane Reade, Inc.,*
 107 F. App'x 250 (2d Cir. 2004) ...................................................................................12

*Okley v. Hyperion 1999 Term Trust, Inc.,*
 98 F.3d 2 (2d Cir. 1996)...............................................................................................16

*Panther Partners, Inc. v. Ikanos Communications,*
 538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd,* 347 F. App'x 617 (2d Cir. 2009)....21, 22, 23

*In re Ply Gem Holdings Inc. Securities Litigation,*
 135 F. Supp. 3d 145 (S.D.N.Y. 2015)..........................................................................18

*Resnik v. Swartz,*
 303 F.3d 147 (2d Cir. 2002)..........................................................................................12

*Rombach v. Chang,*
 355 F.3d 164 (2d Cir. 2004)......................................................................................12, 13

*Singh v. Schikan,*
 106 F. Supp. 3d 439 (S.D.N.Y. 2015)...........................................................................12

*Stadnick v. Vivint Solar, Inc.,*
 861 F.3d 31 (2d Cir. 2017)............................................................................................22

*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation,*
 774 F. Supp. 2d 584 (S.D.N.Y. 2011)...........................................................................22

*In re TVIX Securities Litigation,*
 25 F. Supp. 3d 444 (S.D.N.Y. 2014), *aff'd,* 588 F. App'x 37 (2d Cir. 2009).................22

*Vaccaro v. New Source Energy Partners L.P.,*
 No. 15 CV 8954(KMW), 2016 WL 7373799 (S.D.N.Y. Dec. 19, 2016) .......................16

*Waterford Township Police & Fire Retirement System v. Regional Management Corp.,*
 No. 14cv3876-LTS, 2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016) ...............................17

*Wilder v. News Corp.,*
 No. 11 Civ. 4947 (PGG), 2015 WL 5853763 (S.D.N.Y. Oct. 7, 2015)...........................12

*Wilson v. Merrill Lynch & Co.,*
 671 F.3d 120 (2d Cir. 2011)............................................................................................4

*In re Xinhua Finance Media, Ltd. Securities Litigation,*
 No. 07 Civ. 3994(LTS)(AJP), 2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) ...................13

iv

**STATUTES**

15 U.S.C. § 77l(a)(2)....................................................................................................11

15 U.S.C. § 77k.............................................................................................................11

15 U.S.C. § 77l.............................................................................................................11

15 U.S.C. § 77o.............................................................................................................11

**REGULATIONS**

17 C.F.R. § 229.303.......................................................................................................16

17 C.F.R. § 229.303(a)...................................................................................................16

17 C.F.R. § 229.303(a)(3)(ii).........................................................................................16

17 C.F.R. § 229.503.......................................................................................................18

Defendants Jianpu Technology Inc. ("Jianpu" or the "Company") and Rong360 Inc.;

China Renaissance Securities (Hong Kong) Limited, China Renaissance Securities (US) Inc.,

Goldman Sachs (Asia) L.L.C., Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, and

Morgan Stanley & Co. International plc (collectively, the "Underwriter Defendants"); and Law

Debenture Corporate Services Inc. and Giselle Manon (collectively, the "Process Agent

Defendants") respectfully submit this memorandum of law in support of their joint motion to

dismiss the Amended Class Action Complaint (ECF No. 30, the "Complaint" or "AC") pursuant

to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

In a textbook case of "fraud by hindsight," plaintiff Panther Partners, Inc. ("Plaintiff")

attempts to manufacture claims under the Securities Act of 1933 based on new regulations that

impacted the entire consumer finance industry and which were implemented *after* the

Company's initial public offering ("IPO").  Unfortunately for Plaintiff, however, the Company's

IPO offering materials specifically warned investors of the very risk that these regulations could

be enacted and of the impact that they could have on the Company.  Because the Complaint is

devoid of any facts demonstrating a single actionable false statement or omission, it should be

dismissed in its entirety with prejudice.

---

[1] The Complaint also names nine officers and directors of Jianpu as defendants:  Daqing (David)
Ye, Yilu (Oscar) Chen, Jiayan Lu, Caofeng Liu, Chenchao Zhuang, James Qun Mi, Kui Zhou,
Yuanyuan Fan, and Denny Lee (collectively, the "Individual Defendants").  (AC ¶¶ 16-19.)
Jianpu, together with the Individual Defendants, Rong360 Inc., the Underwriter Defendants, and
the Process Agent Defendants are collectively referred to herein as "Defendants."  Although the
Individual Defendants have not been served, the Court may nevertheless dismiss the Complaint
in its entirety.  *See, e.g.*, *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14cv9826, 2017 WL
95176, at *1 n.1, *6 (S.D.N.Y. Jan. 10, 2017).

Jianpu is a Beijing-headquartered company that connects lenders and borrowers through its online platform.  These lenders represent a diverse array of financial service providers ("FSPs"), including "emerging technology-enabled FSPs."  Prior to the Company's November 16, 2017 IPO on the New York Stock Exchange ("NYSE"), the FSPs on Jianpu's platform were subject to sparse regulations that provided little concrete guidance.  For example, in 2016, the Chinese government published something called the "Interim Measures," which, as its name suggests, was a provisional attempt at regulation that, among other things, directed relevant agencies and the local authorities to study this emerging industry and fashion appropriate rules of conduct.  Similarly, though a 2015 ruling by China's Supreme People's Court held that the portion of interest rates on loans exceeding 36% would thereafter be considered void, it failed to specify how "interest" was to be calculated.  It was only *after* the Company's IPO that the Chinese government released a notice altering how interest rates are calculated and another notice requiring "P2P" lenders (a type of emerging technology-enabled FSP) to comply with the Interim Measures "to qualify for licensing."

Based on these post-IPO events, Plaintiff alleges that the Company's pre-IPO disclosures were false or misleading under the Securities Act.  Plaintiff's allegations boil down to two alleged omissions:  (i) the presence of "P2P" lenders on Jianpu's platform and the purported market-wide decline in the number of such lenders due to existing regulation and (ii) the effects on Jianpu's platform from future regulation.

As to the first alleged omission, Plaintiff faults the Company for failing to use the term "P2P," a subset of the "emerging technology-enabled FSPs" described in the Company's IPO documents.  Yet Plaintiff cannot explain why Jianpu was obligated to use a term that the Interim Measures themselves—the regulations that Plaintiff claims "established the regulatory

2

framework for online P2P companies in China"—avoids.  Further, Plaintiff does not allege any facts showing that a purported decline in the number of "P2P" lenders in the marketplace had *any* effect on Jianpu before its IPO, much less a material impact requiring disclosure.

As to the second alleged omission, Plaintiff faults the Company for failing to disclose events that occurred *after* the Company's IPO.  The Company did not have a crystal ball, and never claimed it had one:  simply put, "defendants' lack of clairvoyance simply does not constitute securities fraud."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995). Nonetheless, the Company did disclose the current regulatory uncertainty as well as the *types* of additional regulations which might be promulgated—specifically, "new regulations on fees and interest" and new "licensing requirements for online lenders"—and their potential adverse impacts.  (Jianpu's Second Amended Registration Statement, filed on Form F-1 (Nov. 13, 2017), Ex. A, at 21.)[2]  In the face of these robust disclosures that address the precise risks that Plaintiff complains were omitted, Plaintiff's claims of omission fail as a matter of law.

Finally, the Complaint should be dismissed on negative causation grounds.  While negative causation is an affirmative defense, it is appropriate to consider it on a motion to dismiss where, as here, it is apparent from the face of the complaint.  Plaintiff's own allegations demonstrate that the purported "corrective disclosures" could not have caused any decline in Jianpu's share price because the stock drop had already occurred by that time.

---

[2] "Ex. _" refers to exhibits attached to the accompanying Declaration of Robert A. Fumerton, dated June 3, 2019.  All further references to the provisions of the Registration Statement (Ex. A) also incorporate references to parallel provisions of the Prospectus (Ex. B) (collectively, the "Offering Documents"), which are, unless otherwise noted, located at the same page numbers.

## STATEMENT OF FACTS[3]

### A.      The Company and Its Business Model

Founded in 2011, Jianpu is a Beijing-headquartered company that connects lenders and

borrowers in China through its proprietary Internet platform.  (AC ¶ 15.)  Jianpu provides

borrowers with "personalized search results and recommendations" and lenders with "sales and

marketing solutions to reach and serve their target customers more effectively."  (Ex. A at 1.)

Jianpu's platform for the discovery and recommendation of financial products in China helps

borrowers and lenders connect with each other.  (*Id.*)  By the time the Company launched its IPO

on the NYSE on November 16, 2017, over 2,500 FSPs used Jianpu's platform to offer more than

170,000 financial products to approximately 67 million registered users.  (*Id.*)

Jianpu's platform features a broad range of FSPs, including banks, credit card issuers,

consumer finance companies, and micro-loan companies.  (Ex. A at 84; Ex. B at 83.)  In addition

to traditional money-lenders, the Company works with "emerging technology-enabled [FSPs]"—

lenders that interact with customers primarily through the Internet.  (Ex. A at 2.)  So-called

"P2P" lenders—which Plaintiff vaguely defines as "companies . . . [that] enable[e] borrowers

and lenders to bypass traditional financial intermediaries" (AC ¶ 40)—are just a subset of these

emerging technology-enabled FSPs.  (*See* Morgan Stanley Initiation Report on Jianpu (Dec. 14,

2017), Ex. C, at 11 ("Emerging technology-enabled FSPs (such as P2Ps)").)  The large number

and variety of FSPs on Jianpu's platform not only make it easier for Jianpu to satisfy different

---

[3] The facts set forth herein are drawn from the allegations in the Complaint, which are assumed
to be true for purposes of resolving the present motion only, "together with those 'documents . . .
incorporated in it by reference' and 'matters of which judicial notice may be taken.'"  *Wilson v.
Merrill Lynch & Co.*, 671 F.3d 120, 123 (2d Cir. 2011); *see also ATSI Commc'ns, Inc. v. Shaar
Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

4

borrowers' financial needs, but also help the Company diversify its revenue streams, which largely come from the fees it charges FSPs.  (Ex. A at 2.)

B.     **The Regulatory Landscape in China**

Like many companies in emerging industries where entrepreneurship outpaces regulation, Jianpu confronted a regulatory landscape with few signposts at the time of its IPO.  In July 2015, the Chinese government began promulgating "guiding opinions" on certain areas that, in its view, required further "policy support."  (Guidance for the Sound Development of Internet Finance (July 14, 2015), Ex. D, at 1-2.)  Careful not to squash an industry still in its infancy, the authorities adopted an approach that, while seeking to "prevent[] risks," would "encourage" and "promote the sound development of Internet finance."  (*Id.*)

In August 2016, the Chinese authorities released the Interim Measures for the Management of Business Activities of Online Lending Information Intermediaries (the "Interim Measures").  (Interim Measures (Aug. 17, 2016), Ex. E, at 1.)  The Interim Measures established general regulations for the broad category of "online lending information intermediaries."  (*Id.*)  Notably, and contrary to Plaintiff's characterization (AC ¶¶ 41-45), the Interim Measures did not specifically target "P2P" lenders; indeed, the Interim Measures never even used the terms "P2P" or "peer-to-peer."  (*See generally* Ex. E.)

Although the Interim Measures set forth a few prohibitions against fraud, money laundering, and the like, "detailed rules" governing e-lenders' registration and conduct were left to further "develop[ment]."  (*See, e.g.*, *id.* at Art. 4 ("The banking regulatory authority of the State Council and its local offices *shall develop rules* for the supervision and administration of the business activities of online lending information intermediaries."), Art. 5 ("The detailed rules for . . . online lending information intermediaries *shall be developed separately.*"), Art. 33 ("The

5

banking regulatory authority of the State Council and its local offices *shall be responsible for developing* uniform policies and measures for standard development and rules for supervision and administration.") (emphases added).)

The stream of new rules, notices, and guidelines that followed the Interim Measures confirms the Interim Measures' preliminary nature.  As the Complaint acknowledges, from October 2016 to August 2017, the Chinese authorities released no fewer than *six* additional sets of "implementing rules further clarifying the regulatory requirements" for online lenders.  (AC ¶¶ 44, 55.)  Moreover, the basic regulatory infrastructure necessary to implement these embryonic rules, notices, and guidelines had not yet been put in place at the time of Jianpu's IPO.  For example, about a month before Jianpu's IPO, one emerging technology-enabled FSP (PPDAI) described the disarray of China's nascent regulatory regime in its Registration Statement.  When PPDAI attempted to register with the local financial regulatory authority, pursuant to the Interim Measures (Ex. E at Art. 5), it was "[not] permitted" to do so because the local authority was not ready to accept any online lending information intermediaries' applications.  (PPDAI Registration Statement, as filed with the SEC on Oct. 13, 2017, Ex. F, at 19.)

Despite the uncertainty engendered by China's evolving regulatory landscape, Jianpu's business was thriving:  year-over-year revenue from the first half of 2016 to the first half of 2017 increased by 170% after the release of the Interim Measures.  (Ex. A at 2, 76, 114; Ex. B at 2, 75, 113.)  Over the same period, Jianpu's net loss *decreased* by 53.2%, from USD 15.8 million to USD 7.2 million.  (Ex. A at 2, 76, 114; Ex. B at 2, 75, 113; *see also* AC ¶¶ 78-80, 102.)

### C.      Jianpu's Disclosures

Jianpu's Offering Documents underscored the "unclear" and "rapidly evolving"

regulatory regime and warned of its potential implications.  (*See* Ex. A at 78; Ex. B at 77; *contra*

AC ¶ 68.)  The Company's relevant disclosures primarily fall into four categories:

First, the Company disclosed the composition and diversity of its FSP partners,

specifically emphasizing that they included "emerging technology-enabled financial service

providers":

> We have attracted a large and diversified group of financial service providers in
> China to our platform. In the first nine months of 2017, we worked with a total of
> over 2,500 financial service providers, including 257 banks, 21 credit card issuers,
> 10 consumer finance companies, 310 micro-loan companies and other licensed
> financial institutions and 746 emerging technology-enabled financial service
> providers and a variety of local financial service providers, offering a wide variety
> of financial products across a broad credit spectrum.

(Ex. A at 116 (underlining added); Ex. B at 115 (same).)

Second, the Company explicitly warned investors that it was "indirectly subject" to

regulatory risks because "the financial products on [its] platform" were both already subject to

existing regulations and potentially subject to new or heightened regulation:

> ***If any financial product on our platform or the business practice of us or any of
> our financial service providers is deemed to violate any new or existing
> [People's Republic of China ("PRC")] laws or regulations, our business,
> reputation, financial condition and results of operations could be materially
> and adversely affected.***  Financial products and financial institutions are strictly
> regulated in China.  We are not regulated as a financial institution, but we may be
> indirectly subject to PRC financial regulations as a result of the financial products
> on our platform and our services to and cooperation with financial service
> providers. If any financial product on our platform is deemed to violate any PRC
> laws or regulations, we may be liable for listing the product or assisting in
> offering the product on our platform, even if we are not its provider . . . . We may
> have to remove financial products from our platform or terminate relationship
> with financial service providers  . . . .  As a result, our business, reputation,
> financial performance and prospects could be materially and adversely affected.

(Ex. A at 23 (underlining added).)

7

_Third_, the Company warned investors about the uncertainty engendered by the "rapidly-evolving" regulatory landscape in China:

> ***Regulatory uncertainties relating to online consumer finance in China could harm our business, financial condition and results of operations.*** Our business or the businesses of our financial service providers may be subject to a variety of PRC laws and regulations governing financial services. The application and interpretation of these laws and regulations are ambiguous and may be interpreted and applied inconsistently between different government authorities. <u>In particular, the PRC government has not adopted a clear regulatory framework governing the new and rapidly-evolving online consumer finance market</u>, which is the source of the transactions that our platform facilitates.

(_Id._ at 21 (underlining added).)

_Finally_, the Company even provided specific examples of _how_ regulations might become more restrictive or be enforced more aggressively, and warned investors that these potential regulatory changes could "materially and adversely affect" the Company's "business, financial condition, and prospects":

> The PRC government may adopt a stringent regulatory framework for the online and mobile consumer finance market in the future, and impose specific requirements (including licensing requirements) on market participants. The PRC government may also enhance the implementation of existing laws and regulations. There has been media speculation that the PRC government may, among other things, (i) impose <u>new regulations on fees and interest</u> charged by financial service providers, (ii) <u>introduce licensing requirements for online lenders</u>, (iii) close down unlicensed financial service providers that take deposits from consumers and (iv) <u>close down financial service providers that engage in illegal collection practices</u>. A significant number of financial service providers on our platform operate in the online and mobile consumer finance market. Consequently, <u>new government laws and regulations, stricter enforcement of existing laws and regulations or even speculation regarding such developments may materially and adversely affect our business, financial condition and prospects.</u>

(_Id._ (underlining added).)

D.      **Post-IPO Regulations**

Just as the Company had warned, a flurry of new regulations followed Jianpu's IPO.

Because these events postdate the IPO, the Company could not possibly have disclosed the

specific regulations in its Offering Documents.  Nevertheless, they were precisely the kinds of

risks—e.g., "new regulations on fees and interest charged by [FSPs]" and "licensing

requirements for online lenders"—that the Company warned investors could "materially and

adversely affect our business."  (Ex. A at 21.)

1.      **Annualized Interest Rate Cap of 36%**

The first post-IPO regulatory change involved the 36% cap on interest rates.  (AC ¶ 95.)

In 2015, China's Supreme People's Court held that any loan agreement requiring the payment of

interest above an annualized rate of 36% was void to the extent the interest exceeded that rate,

but the court did not specify how this rate was to be calculated.  (*See* Provisions of the Supreme

People's Court (Aug. 6, 2015), Ex. G, at Art. 26.)  Contrary to Plaintiff's claim that the ruling

prohibited all loans with interest rates over 36% (*see* AC ¶ 60), the 2015 ruling provided that

only the interest in *excess* of the 36% rate "shall be invalid" (*see* Ex. G at Art. 26).  That

changed, however, on December 1, 2017 (15 days after the IPO), when the Chinese government

issued a notice altering how the interest rate should be calculated.  (Notice on the Regulation and

Rectification of the "Cash Loan" Business (Dec. 1, 2017), Ex. H, at Art. I. 2.)  Whereas some

lenders had excluded fees and other miscellaneous costs from the rate calculation, the notice

9

stated for the first time that the rate should include "[t]he comprehensive capital cost."[4]  (Ex. H at Art. I.2; AC ¶ 95 ("clarified that the 36% cap was an 'all-in' interest rate").)

### 2.   Licensing Requirements

The second post-IPO regulatory change occurred on December 8, 2017, when Chinese regulatory authorities issued a notice announcing "that P2P companies ***must comply with the Interim Measures*** announced in August 2016 ***in order to qualify for licensing***."  (AC ¶ 96; *see also* Regulations on Rectifying P2P Online Lending Risks (Dec. 8, 2017), Ex. J.)  Paradoxically, the authorities also announced that they would ***not*** register any unregistered online lenders that began operations after the publication of the Interim Measures.  (Ex. J at Art. II.3.)

### 3.   Impact

The analyst reports cited in the Complaint describe the likely negative impact of these *post*-IPO regulations on Jianpu.  (Ex. C at 1; J.P. Morgan Initiation Report on Jianpu (Dec. 20, 2017), Ex. K, at 20-21.)  Furthermore, according to the Complaint, "market adjustments within the *new* regulatory framework" caused the growth rate of Jianpu's revenues attributable to loan recommendation services to slow from more than 400% year-over-year for the third and fourth quarters of 2017 to 46.5% year-over-year for the first quarter of 2018.  (AC ¶¶ 102-103 (emphasis added).)  Even still, however, a significant portion (36.5%) of the post-IPO drop in stock price occurred *before* the Chinese authorities issued the post-IPO regulations at issue here. (*See infra* at 23.)

---

[4] Documents cited in the Complaint indicate that even after the December 1, 2017 clarification, aspects of the notice and the 36% cap remained unclear.  (*See, e.g.*, Ex. C at 15 ("how regulators interpret and enforce this rule remains uncertain"); Credit Suisse Initiation Report on "China P2P Sector" (Dec. 6, 2017), Ex. I, at 12 ("However, the regulators have not clarified the calculation method to annualize the rate").)

E.      **The Current Lawsuit**

Seizing on the "bad news" of *post*-IPO regulatory tightening that impacted the entire

consumer finance industry, Plaintiff brings this putative class action, pursuant to Sections 11,

12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l*, 77o,

arguing that Jianpu failed to disclose that the Company and the lenders on its platform faced

regulatory risks that might adversely affect Jianpu's performance.  (*See, e.g.*, AC ¶¶ 38, 51.)  But

Plaintiff has pled no facts to support these claims.  For the reasons discussed below, the

Complaint should be dismissed in its entirety with prejudice.

## ARGUMENT

I.      **PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTIONS 11 OR 12(a)(2)**

To state a cause of action under either Sections 11 or 12(a)(2), Plaintiff must allege that

the Offering Documents contained (1) a material misrepresentation, (2) a material omission in

contravention of an affirmative legal disclosure obligation, or (3) a material omission of

information that was necessary to prevent existing disclosures from being misleading.[5]  *In re*

*Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).  For an omission to be

"material," "there must be a substantial likelihood that the disclosure of the omitted fact," when

considered in the context of the Offering Documents in their entirety, "would have been viewed

by the reasonable investor as having significantly altered the total mix of information made

---

[5] While Section 11, 15 U.S.C. § 77k, covers registration statements, and Section 12(a)(2), 15 U.S.C. § 77*l*(a)(2), covers prospectuses, the two are "Securities Act siblings with roughly parallel elements."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359.

available."[6]  *Singh v. Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015).  "[E]ven if the information would have been material," "it is well established that there is no liability in the absence of a duty to disclose."  *In re Morgan Stanley Tech. Fund Sec. Litig.*, 643 F. Supp. 2d 366, 375 (S.D.N.Y. 2009), *aff'd,* 592 F.3d 347 (2d Cir. 2010); *see also Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor.").

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice [to establish entitlement to relief]."  *In re Iconix Brand Grp., Inc.*, No. 15 Civ. 4860(PGG), 2017 WL 4898228, at *12 (S.D.N.Y. Oct. 25, 2017) (Gardephe, J.) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Instead, a complaint must "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face'" to "nudg[e]" its claims "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 678, 684.  "A complaint is inadequately pled 'if it tenders "naked assertion[s]" devoid of "further factual enhancement."'"  *In re Iconix Brand*, 2017 WL 4898228, at *12 (alteration in original) (quoting *Iqbal*, 556 U.S. at 678); *see also Wilder v. News Corp.*, No. 11 Civ. 4947 (PGG), 2015 WL 5853763, at *4 (S.D.N.Y. Oct. 7, 2015) (Gardephe, J.) (same).[7]

---

[6] Plaintiff attempts to re-cast some of its omissions claims as alleged misrepresentations.  (*See, e.g.*, AC ¶ 67 ("statement was an inaccurate statement of material fact because it negligently failed to disclose the presently-existing regulations"); *see also id.* ¶¶ 57-58, 61-63, 66-69, 78-80.) These are still the same claims of omissions, which fail for the reasons described below.  (*See infra* §§ I.A-B.)  Moreover, these claims also fail because Plaintiff does not adequately allege that the statements are in fact false, and "[a]ccurate statements about past performance are self[-]evidently not actionable under the securities laws."  *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004).

[7] To the extent Plaintiff's claims "sound in fraud," they are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  *See Rombach v. Chang*, 355 F.3d 164, 171-72

*(cont'd)*

A.      **Jianpu Did Not Fail to Disclose a Decline in the Number of "P2P" Lenders**

Plaintiff's first claim is that the Offering Documents allegedly failed to disclose that

"P2P" lenders were regulated and were on Jianpu's platform, and that existing regulations had

already led to a decline in the number of "P2P" lenders in the marketplace.  (*See* AC ¶¶ 4, 38-39,

59, 65, 81, 90.)  This argument fails for two reasons.  First, these risks were disclosed:  the

Offering Documents expressly warned that the FSPs on its platform—a category that included

"P2P" lenders—were subject to regulation; that they could be subject to further regulation or

heightened enforcement; that the number of FSPs on Jianpu's platform might decrease as a

result; and that such a decrease could materially affect the Company's revenues.  Second,

Plaintiff fails to plead any facts that the purported industry-wide decrease in the number of FSPs

was known to the Defendants or, in any event, had any impact, much less a material impact, on

Jianpu's operations before its IPO.

1.      **Jianpu Fully Disclosed Both the FSPs on Its Platform and the
        Regulations Affecting Them**

Plaintiff alleges that Jianpu should have disclosed additional information about the FSPs

on its platform and the regulations affecting them.  But the Company disclosed precisely this

information in multiple ways.[8]  First, the Company disclosed its "[e]xtensive and diversified

_____

*(cont'd from previous page)*

(2d Cir. 2004).  Regardless, Plaintiff fails to meet the requirements of Rule 8(a), and the
Complaint should be dismissed no matter the standard.

[8] To the extent Plaintiff quibbles with the adjectives Jianpu used to describe the lenders on its
platform—e.g., as "extensive," "large and diversified," "wide," and "broad" (*see* AC ¶¶ 58, 60,
62)—these statements are merely "expressions of puffery and corporate optimism [that] do not
give rise to securities violations."  *Rombach*, 355 F.3d at 174; *see also In re Xinhua Fin. Media,
Ltd. Sec. Litig*, No. 07 Civ. 3994(LTS)(AJP), 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009)
("To the extent that Plaintiffs' allegation focuses on the adjectives used . . . , such as 'strong,'

*(cont'd)*

network of [FSPs]," which includes "banks," "consumer finance companies," "micro-loan companies," "other licensed financial institutions," and "emerging technology-enabled [FSPs]." (AC ¶ 40; *see also id.* ("large and diversified group of [FSPs]").) As one analyst report cited in the Complaint acknowledges, "[e]merging technology-enabled FSPs" are a category of lenders that includes "P2P" lenders.  (*See* Ex. C at 11 ("Emerging technology-enabled FSPs (such as P2Ps)").)

Second, the Company described the general attributes of some of the loan products available on its platform to enable investors to understand, functionally, just what the various definitions and categories of lenders meant.  (*See, e.g.*, Ex. A at 119 ("Consumer loan products on our platform generally have terms ranging from one month to three years"), 121 ("Micro-loans from emerging technology-enabled financial service providers may be approved within a few minutes"), 123 ("[R]ecent college graduates . . . come to our platform looking for small unsecured consumer loans"); Ex. B at 118, 120, 122.)

Third, the Offering Documents disclosed that all FSPs on Jianpu's platform, including emerging technology-enabled FSPs (and therefore "P2P" lenders), were *already* subject to regulations.  (Ex. A at 21 ("enhance the implementation of *existing laws and regulations*"), 21 ("stricter enforcement of *existing laws and regulations*"), 23 ("Financial products and financial institutions *are* strictly regulated in China"), 38 ("recently *enacted* laws and regulations") (emphases added).)

---

'experienced,' and 'capable,' these soft adjectives are nothing more than puffery, which is not actionable under the securities laws.").

Finally, the Offering Documents disclosed the Company's dependence on FSPs for its continuing success and the various risks—regulatory, reputational, relational, etc.—that might threaten its symbiotic relationship with the FSPs.  For example, in a heading blaring in both bold and italics, the Offering Documents cautioned:  "***If any financial product on our platform or the business practice of us or any of our financial service providers is deemed to violate any new or existing PRC laws or regulations, our business, reputation, financial condition and results of operations could be materially and adversely affected***."  (Ex. A at 23.)  The admonition continued:  "If any of our financial service providers is deemed to violate any PRC laws or regulations . . . [w]e may have to remove financial products from [the Company's] platform or terminate relationship[s] with financial service providers."  (*Id.*)  The Company warned—again in a heading in bold and italics—that "***[f]ailure to maintain relationships with financial service providers or develop new ones may materially and adversely affect our business and results of operations***."  (*Id.* at 18.)

Faced with these robust disclosures, Plaintiff cavils that the Company should have used the magic word "P2P."  But Plaintiff points to nothing that requires the Company to do so. Indeed, despite Plaintiff's allegation that the 2016 Interim Measures "established the regulatory framework for online P2P companies in China" (AC ¶ 42), ***the Interim Measures themselves do not use the term "P2P"*** (*see generally* Ex. E).  Instead, like the Offering Documents ("emerging technology-enabled financial service providers"), the Interim Measures chose a broader term ("online lending information intermediaries") to capture the diversity of companies in the rapidly evolving online lending space.  (*See generally* Ex. E.)

Under Second Circuit case law, an alleged omission is immaterial as a matter of law where, as here, "[t]he allegedly omitted facts were either disclosed or implied in the offering

memoranda." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002); *Okley v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).   No reasonable investor could have read the Company's detailed disclosures and failed to understand that the FSPs on Jianpu's platform—including "P2P" lenders and other emerging technology-enabled FSPs—were subject to regulations that could cause a decline in the number of FSPs on Jianpu's platform and materially harm the Company's performance.   *See Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009).   Thus, Plaintiff's claim of omission fails.   *See Halperin*, 295 F.3d at 361.

### 2.   Plaintiff Fails to Allege that the Purported Decline in the Number of "P2P" Lenders Before the IPO Was "Known" or "Material"

Relatedly, Jianpu had no obligation—under either Sections 11 and 12 or Item 303 of Regulation S-K, 17 C.F.R. § 229.303—to disclose that, prior to the IPO, existing regulations were giving rise to a downward "trend" in the number of "P2P" lenders.   (*See* AC ¶¶ 90, 92-93.) Item 303 requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. § 229.303(a)(3)(ii).   This requirement applies only where the information was both:   (i) presently known to management and (ii) reasonably likely to have material effects on the registrant's financial condition or results of operation.   17 C.F.R. § 229.303(a) instruction 3; *see also Vaccaro v. New Source Energy Partners L.P.*, No. 15 CV 8954(KMW), 2016 WL 7373799, at *5 (S.D.N.Y. Dec. 19, 2016). Plaintiff does not allege any facts to satisfy either of these two requirements.

As a threshold issue under Item 303, Plaintiff fails to plead that any of the Defendants had "actual knowledge" of the alleged "trend."   While Section 11 claims generally do not require

16

pleading scienter, Item 303's knowledge requirement imposes an obligation on Plaintiff to plead, with specificity, facts establishing that the defendant had *actual* knowledge of the purported trend.  *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) ("It is *not* enough that [management] *should have known* of the existing trend, event, or uncertainty." (emphases added)).  However, Plaintiff expressly disclaims any such allegation here.  (*See* AC ¶¶ 115, 125, 133.)  Plaintiff cannot have it both ways—the disclaimer of any allegation of Defendants' knowledge alone is fatal to Plaintiff's claims.[9]  *See Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07 Civ. 10528, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010).

Equally fatal to both its Item 303 and omission claims on this issue, Plaintiff alleges *no* facts regarding *any* impact on Jianpu before its IPO, much less a materially adverse one, from the alleged market-wide decline in the number of "P2P" lenders.  (*See* AC ¶¶ 45-50, 94-106.)  Instead, the Complaint alleges only (i) a pre-IPO industry-wide decrease in the number of "P2P" lenders, untethered to Jianpu or its FSPs (*id.* ¶¶ 45-50), and (ii) the impact of the *post*-IPO regulations issued in early December 2017 (*see id.* ¶¶ 94-106; *see also id.* ¶ 105 ("***the new regulatory framework since December 2017***")).  Plaintiff's bare conclusion that "this decline was reasonably likely to have a material, adverse effect on Jianpu's revenues from loan recommendation services" is devoid of any "additional factual context" and is entitled to no

---

[9] Similarly, Plaintiff's claim that statements of opinion in the Offering Documents are false or misleading (AC ¶¶ 66-77) fails for two independent reasons: (i) as described herein, Plaintiff has not adequately alleged that they are false (*see supra* §§ I.A-B); and (ii) Plaintiff disavows any claims based on "fraudulent intent" (AC ¶¶ 115, 125, 133).  *See Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, No. 14cv3876-LTS, 2016 WL 1261135, at *9 (S.D.N.Y. Mar. 30, 2016) (plaintiff must allege opinion statements "were both false and not honestly believed when they were made").

weight.  (AC ¶¶ 59, 65, 81, 90); *see In re Ply Gem Holdings Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 151 (S.D.N.Y. 2015).

Worse, the Complaint's allegations affirmatively undermine the inference of material adverse impact that Plaintiff seeks to draw.  The Complaint and the documents incorporated therein allege *no impact whatsoever* on Jianpu due to the purported pre-IPO industry-wide decrease in the number of "P2P" lenders; to the contrary, they describe the Company's continued and "substantial[]" revenue growth.  (*See* AC ¶¶ 31 ("Since . . . 2011, Jianpu's revenues have grown substantially"), 79 ("substantial y-o-y growth in the number of loan applications on Jianpu's platform" since 2015); Jianpu's Third Quarter 2017 Earnings Call (Dec. 12, 2017), Ex. L (describing 400+% year-over-year growth for quarter "largely due to the increase in total revenues from recommendations services, driven by a huge increase in loan applications on our platform"); Jianpu's Fourth Quarter 2017 & Full Year 2017 Earnings Call (Mar. 5, 2018), Ex. M ("Revenues from recommendation services for loans increased by 429% . . . primarily due to the significant increase in the number of loan applications on the Company's platform.").)  Because Plaintiff does not allege any facts showing any actual or potential impact on Jianpu from the purported industry-wide decrease in the number of "P2P" lenders before the IPO—much less a material impact, described "both quantitative[ly] and qualitative[ly]"—the claim should be dismissed.  *In re Ply Gem Holdings Inc. Sec. Litig.*, 135 F. Supp. 3d at 150.[10]

---

[10] Plaintiff's contention that the Company breached a duty to disclose under Item 503, of Regulation S-K, 17 C.F.R. § 229.503, which requires, "[w]here appropriate, . . . a discussion of the most significant factors that make the offering speculative or risky," fails for the same reasons.  (*See* AC ¶¶ 92-93); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 n.4 (2d Cir. 2011) (applying same materiality standard to Item 303 and Item 503 disclosures).

**B.      Jianpu Adequately Disclosed the Regulatory Risk to Its Financial Performance**

Plaintiff's second alleged omission is that the Offering Documents failed to disclose the impact that existing and more stringent Chinese laws and regulations were having and would have on the FSPs and Jianpu's financial performance—specifically, that Jianpu failed to disclose that FSPs on its platform were violating licensing requirements and interest rate restrictions. (*See, e.g.*, AC ¶¶ 51, 73, 75.)  Plaintiff's claim fails for two reasons.  <u>First</u>, the Offering Documents disclosed the risk that lenders on Jianpu's platform were subject to existing regulations, as well as the potential for new and heightened regulation, that could, in turn, materially affect the Company's operations.  <u>Second</u>, Jianpu's FSPs were not in violation of the licensing and 36% interest rate restrictions at the time of the IPO, and Jianpu could not have foretold post-IPO regulatory changes.

**1.      Jianpu Specifically Disclosed That Lenders on Its Platform Could Be Subject to Further Interest Rate and Licensing Requirements**

As described above, the risks of existing regulation, new regulation, and heightened enforcement were robustly disclosed.  (*See supra* § I.A.1.)  But the Company went further and disclosed the very risks that Plaintiff alleges were omitted—namely, heightened regulatory enforcement of licensing requirements and new interest rate regulations (AC ¶ 71):

  i.      "The PRC government extensively regulates the internet industry, including . . . *licensing and permit requirements for companies in the internet industry* . . . . These laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainties" (Ex. A at 39 (emphasis added));

  ii.      FSPs may face "*new regulations on fees and interest* charged by financial service providers," and "*licensing requirements* for online lenders," which "may materially and adversely affect [Jianpu's] business" (*id.* at 21 (emphases added));

iii.   "The PRC government may. . . impose specific requirements (including *licensing requirements*) on market participants" (*id.* (emphasis added));

iv.   "[N]ew government laws and regulations, stricter enforcement of existing laws and regulations or even speculation regarding such developments may materially and adversely affect our business, financial condition and prospects" (*id.*).

### 2.   Lenders on Jianpu's Platform Were Not in Violation of Applicable Regulations Prior to the IPO

Next, relying on a "fraud by hindsight" theory, Plaintiff asserts that the lenders on Jianpu's platform were in violation of the 36% interest rate cap or licensing requirements at the time of the IPO.  (*See, e.g.*, AC ¶¶ 77 (alleging "loans on Jianpu's platform were *presently* failing to comply with applicable PRC laws and regulations, including the licensing . . . requirements . . . and the 36% APR cap."), 81 (same), 91 (same).)  The Complaint itself contradicts this assertion.  It alleges that the applicable regulations clarifying the 36% cap and imposing stringent licensing requirements were introduced on December 1 and December 8, 2017—weeks *after* Jianpu's November 16, 2017 IPO.  (*See id.* ¶¶ 95-97; *see also supra* p. 9-11.)[11]

i.   "Less than a month *after the IPO*, Chinese authorities *issued* regulations designed to enhance government enforcement of both the Interim Measures (including their licensing requirements) and the 36% APR cap" (AC ¶ 94 (emphases added));

ii.   "Less than a month *after the IPO*, regulatory authorities in China *introduced* a series of measures designed to enhance governmental enforcement of both the Interim Measures and the 36% APR cap" (*id.* ¶ 7 (emphases added));

iii.   "[O]ne month *after the IPO,* following *additional* regulations designed to step up enforcement of the 36% APR cap" (*id.* ¶ 56 (emphases added));

---

[11] The analyst reports cited by Plaintiff (AC ¶ 100) likewise make clear that both the licensing requirement and interest rate cap post-dated Jianpu's IPO.  (*See* Ex. C at 15 ("The People's Bank of China (PBOC) and China Banking Regulatory Commission (CBRC) jointly *issued* a notice on *December 1, 2017*, on the cleanup of cash loans . . . . [w]ith *stricter* requirements on *licensing* that officially ban unlicensed/unregistered entities from engaging in lending business . . . . The *new rules* also cap all-in APR (interest + fees) at 36%." (emphases added)).)

20

iv.        "On December 1, 2017 . . . issued a notice . . . and *clarified* that the 36% cap was an 'all-in' interest rate" (*id.* ¶ 95 (emphasis added));

v.        "[O]n December 8, 2017 . . . *issued a notice* providing . . . that P2P companies must comply with the Interim Measures announced in August 2016 in order to qualify for licensing" (*id.* ¶ 96 (emphasis added));

vi.      "*Enhanced* enforcement of the Interim Measures and the 36% cap" (*id.* ¶ 101 (emphasis added));

vii.     "*[S]tepped up* enforcement of the Interim Measures and the 36% cap" (*id.* ¶102 (emphasis added)).

Plaintiff strains to avoid this chronology by describing these post-IPO regulatory changes as "heightened regulatory enforcement" rather than as new regulations.  (*Compare* AC ¶¶ 60, 64, 71, 81, *with, e.g.*, AC ¶¶ 7 ("introduced a series of measures"), 94 ("issued regulations"), 95 ("issued a notice").)  Where, as here, the regulatory changes were implemented by new, separate laws and regulations—as Plaintiff concedes in the allegations detailed above—this is a distinction without a difference.  Regardless, the Company disclosed the risks of entirely new regulations (*see supra* § I.A.1) *and* "enhance[d]" implementation and enforcement (*see supra* § I.B.1).

Nor could the Company be expected to disclose anything beyond the *risk* of additional regulations or enhanced enforcement: the Securities Act does not require issuers to be fortune tellers.  *In re Express Scripts Holdings Co. Sec. Litig.*, No. 18-1850-cv, 2019 WL 2004302, at *4 (2d Cir. May 7, 2019) ("Much of what [plaintiff] alleges is 'fraud by hindsight,' but Defendants 'need not be clairvoyant.'" (citation omitted)).  Plaintiff has not alleged—and cannot allege— that, at the time of its IPO on November 16, 2017, Jianpu knew or could have known about the December 1, 2017 36% APR clarification or the December 8, 2017 licensing requirement. *Panther Partners, Inc. v. Ikanos Commc'ns*, 538 F. Supp. 2d 662, 670 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009); *id*. at 664 (no duty to disclose "events that were either

21

unknown or unknowable at the time of the disclosures"); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud."); *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y. 2014) (rejecting Section 11 allegations based on "hindsight" or "backward-looking assessment"), *aff'd*, 588 F. App'x 37 (2d Cir. 2009). Plaintiff's attempt to require the Company to predict the future of Chinese regulation and enforcement is far outside the bounds of Securities Act liability. *Panther Partners*, 538 F. Supp. 2d at 669 (plaintiff's attempt to "plead[] with 20/20 hindsight" fails); *see also Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (plaintiff's claim fails where defendant's "registration statement included ample warning that its business could be affected by evolving regulatory regimes").

## II.   PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BASED ON NEGATIVE CAUSATION

Finally, the Complaint should be dismissed under the doctrine of negative causation where, as here, "the absence of loss causation is apparent on the face of the complaint." *Blackmoss Invs.*, 2010 WL 148617, at *11; *see also In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011) ("Section 11(e) makes the absence of loss causation an affirmative defense" and "[t]he complaint, therefore, may be dismissed [where] . . . it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue"). Although loss causation is not an element of Plaintiff's Sections 11 and 12(a) claims, Plaintiff devotes an entire section of its Complaint to it and attempts to attribute Jianpu's stock drop to the following:

  i.   the December 1 and December 8, 2017 Notices, which "enhance[d] government enforcement of both the Interim Measures (including their licensing requirements) and the 36% APR cap" (AC ¶¶ 94-96);

ii.     Jianpu's December 12, 2017, March 5, 2018, May 29, 2018, and February 25, 2019 earnings calls (*id*. ¶¶ 98-99, 102-105); and

iii.    the Credit Suisse, Morgan Stanley, and J.P. Morgan analyst reports (*id*. ¶ 100).

(*See generally id*. ¶¶ 94-107 ("Post-IPO Events").)

As an initial matter, even before the Chinese government issued the new regulations at issue on December 1 and December 8, 2017 (the earliest possible alleged "revelations" (*id*. ¶¶ 94-96)), the price of Jianpu's ADSs had already fallen 36.5% from the IPO price of $8.00 to $5.08 on November 30, 2017.  "Under the 1933 Act, '[t]he price decline before disclosure may not be charged to defendants.'"  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003) (citation omitted).  Hence, as a matter of law, Jianpu cannot be held responsible for the 36.5% drop in its stock price that occurred prior to any alleged corrective disclosures.  *See In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 419 (S.D.N.Y. 2009); *Blackmoss Invs.*, 2010 WL 148617, at *11.

As for the alleged subsequent disclosures, none "reveal[ed] to the market the falsity" of anything in the Offering Documents.  *In re Britannia*, 665 F. Supp. 2d at 419.  Instead, they show only Plaintiff's attempt to plead fraud by "20/20 hindsight."  *Panther Partners*, 538 F. Supp. 2d at 669.  While the Company explicitly warned of the potential for regulatory changes in its Offering Documents, it could not have foreseen the details of the post-IPO regulations.  *See Halperin*, 295 F.3d at 360; *Panther Partners*, 538 F. Supp. 2d at 664.  The Complaint confirms Plaintiff's fraud-by-hindsight theory when it lets slip that "[t]his *heightened* regulatory enforcement *caused* the growth in Jianpu's revenues from recommendation services to slow dramatically . . . .  The price of Jianpu's ADSs declined in tandem with the Company's decline in revenue growth."  (AC ¶¶ 7-8 (emphases added).)

That Plaintiff's alleged "revelations" all dealt with post-IPO events is also evident from the earnings calls referenced in the Complaint.  As the call transcripts make plain, the December 12, 2017 and March 5, 2018 earnings calls concerned only the effects of the new post-IPO regulations—not any revelation of facts that predated the IPO.  (*See* Ex. L ("recent . . . developments"; "tightening"; "changes in the regulatory environment"; "regulatory change"; "new"); Ex. M ("shifting regulatory policies"; "Since November 2017, we have seen significant developments in the regulatory environment"; "new regulations"; "new regulatory framework"; "after the regulation came out in December"; "Keep in mind the regulation came out around December"); *see also* AC ¶ 99 ("regulatory changes put in place in the fourth quarter [of 2017]" (citing Ex. M)).)  The same is true for the later earnings calls, which also refer only to the impact of the post-IPO regulations.  (*See* Jianpu's First Quarter 2018 Unaudited Financial Results Press Release (May 29, 2018), Ex. N ("greater clarity on the regulatory front"); *see also* AC ¶ 103 (citing May 29, 2018 earnings call, "market adjustments within the new regulatory framework"); Jianpu's Fourth Quarter 2018 Earnings Call (Feb. 25, 2019), Ex. O, at 3 ("tightening regulatory environment through the year"), 6 ("the new regulatory framework since December 2017").)

Plaintiff's cited analyst reports are to the same effect—they all discuss the implications of the *post*-IPO regulations only.  (*See generally* Ex. C; Ex. I; Ex. K; *compare* AC ¶ 100 ("rising compliance cost and scrutiny"), *with* Ex. I at 1 ("In the past two weeks [since December 6, 2017], regulators strengthened rectification of cash loans (in particular strict enforcement of the 36% rate cap) . . . .  We believe the rising compliance cost and scrutiny will push many small players out of the market . . . .").)

For the foregoing reasons, negative causation is established on the face of the Complaint, and the Complaint must be dismissed.  *Blackmoss*, 2010 WL 148617, at *11.

## III.    PLAINTIFF FAILS TO PLEAD CONTROL PERSON LIABILITY

Because Plaintiff's Sections 11 and 12 claims fail, the derivative claims asserted under

Section 15 of the Securities Act also fail.  *Hutchison*, 647 F.3d at 490.

## CONCLUSION

For the foregoing separate and independent reasons, Defendants respectfully request that

the Complaint be dismissed with prejudice.

Dated:  New York, New York
        June 3, 2019

                                        Respectfully submitted,

/s/ *Scott D. Musoff*                           /s/ *David B. Hennes*
Scott D. Musoff                                 David B. Hennes
(scott.musoff@skadden.com)                      (david.hennes@ropesgray.com)
Robert A. Fumerton                              Martin J. Crisp
(robert.fumerton@skadden.com)                   (martin.crisp@ropesgray.com)
Vincent M. Chiappini                            Erin R. Macgowan
(vinnie.chiappini@skadden.com)                  (erin.macgowan@ropesgray.com)
SKADDEN, ARPS, SLATE,                           ROPES & GRAY LLP
    MEAGHER & FLOM LLP                          1211 Avenue of the Americas
Four Times Square                               New York, New York 10036
New York, New York 10036                        Telephone:  (212) 596-5000
Telephone:  (212) 735-3000                      Facsimile:  (212) 596-9090
Facsimile:  (212) 735-2000

*Attorneys for Defendants Jianpu Technology*    *Attorneys for Defendants China Renaissance*
*Inc., Rong360 Inc., Law Debenture Corporate*   *Securities (Hong Kong) Limited, China*
*Services Inc., and Giselle Manon*              *Renaissance Securities (US) Inc., Goldman Sachs*
                                                *(Asia) L.L.C., Goldman Sachs & Co. LLC,*
                                                *J.P. Morgan Securities LLC, and Morgan Stanley*
                                                *& Co. International plc*