UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PANTHER PARTNERS INC., individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION & ORDER** |
| JIANPU TECHNOLOGY INC., DAQING (DAVID) YE, YILU (OSCAR) CHEN, JIAYAN LU, CAOFENG LIU, CHENCHAO ZHUANG, JAMES QUN MI, KUI ZHOU, YUANYUAN FAN, RONG360 INC., GOLDMAN SACHS (ASIA) L.L.C., MORGAN STANLEY & CO. INTERNATIONAL PLC, J.P. MORGAN SECURITIES LLC, and CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, inclusive, | 18 Civ. 9848 (PGG) |
| Defendants. | |

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Panther Partners Inc. brings this putative class action for violations of the Securities Act of 1933 in connection with the initial public offering ("IPO") of Defendant Jianpu Technology Inc. ("Jianpu").  (Am. Cmplt. (Dkt. No. 30))  Defendants have moved to dismiss. (Dkt. No. 52)  For the reasons stated below, Defendants' motion will be denied.

## BACKGROUND[1]

### I.    FACTS

#### A.    Parties

Plaintiff owns American Depositary Shares ("ADSs") issued by Jianpu in connection with its November 16, 2017 IPO.  (Am. Cmplt. (Dkt. No. 30) ¶¶ 1, 14)

---

[1] Unless otherwise noted, the following facts are drawn from the Complaint and are presumed true for purposes of resolving Defendants' motion to dismiss.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

Defendant Jianpu is a "Beijing-based holding company which, through its subsidiaries, operates an online platform that provides users with research and recommendations on financial products in China."  (Id. ¶ 15)  Jianpu's ADSs trade on the New York Stock Exchange under the ticker symbol "JT."  (Id.)

Defendant Rong360 Inc. is Jianpu's parent company.  (Id. ¶ 22)

Defendant Ye is a "Jianpu co-founder, [who] served as Chairman of the Company's Board of Directors and as its Chief Executive Officer at the time of the IPO."  (Id. ¶ 16)

Defendant Chen "served as CFO of the Company at the time of the IPO."  (Id. ¶ 17)

Defendants Lu, Liu, Zhuang, Mi, Zhou, Fan, and Lee each "served as a director of the Company at the time of the IPO."  (Id. ¶ 18-19)

Defendant Manon was "Jianpu's authorized U.S. representative in connection with her position as Service of Process Officer for Defendant Law Debenture Corporate Services Inc.," which is a New York corporation that Jianpu designated as its agent for service of process in New York.  (Id. ¶¶ 20-21)

Defendants Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. International plc, J.P. Morgan Securities LLC, and China Renaissance Securities (Hong Kong) Limited "served as joint bookrunners of the IPO and representatives of the underwriters."  (Id. ¶ 23)

Defendant Goldman Sachs & Co. LLC is "Goldman Sachs' SEC-registered broker-dealer affiliate in the U.S." and "acted as an underwriter of the ADSs."  (Id. ¶ 24)

Defendant China Renaissance Securities (US) Inc. is China Renaissance Securities (Hong Kong) Limited's "SEC-registered broker-dealer affiliate in the U.S." and "acted as an underwriter of the ADSs."  (Id. ¶ 25)

### B.   The IPO

On October 20, 2017, Jianpu filed an SEC Form F-1 to register the IPO, which was soon followed by an SEC Form F-6.  After amendments, the SEC declared these forms – collectively, the "Registration Statement" – effective on November 15, 2017.  (Id. ¶ 33)  On November 17, 2017, Jianpu filed its IPO prospectus on Form 424B, "which incorporated and formed part of the Registration Statement" and offered to sell 22.5 million ADSs for $8.00 each.  (Id. ¶ 34)  All the ADSs were sold; net proceeds totaled $164.9 million.  (Id. ¶ 35)

Plaintiff alleges that the Registration Statement "failed to disclose the extent to which existing regulations in China – as well as the risk of heightened regulatory enforcement – threatened Jinapu's revenues from loan recommendation services – the source of 80% of its revenues at the time of the IPO."  (Id. ¶ 37)  According to Plaintiff, the Registration Statement did not disclose two material risks:

> First, the Registration Statement failed to disclose Jianpu's exposure to financial service providers that were subject to regulations in China governing 'peer-to-peer' (or 'P2P') lending, known as the Interim Measures – or that the Interim Measures were causing a decline in the number of P2P financial service providers operating in China at the time of the IPO.  Second, the Registration Statement failed to disclose that a material portion of the loans offered by financial service providers on Jianpu's platform featured annualized interest rates (also known as 'APR') in excess of 36%, in violation of [the People's Republic of China's] laws and regulations.

(Id. ¶ 4)

As to the first alleged undisclosed risk, the Amended Complaint provides a detailed overview of China's regulatory scheme for P2P lending.  In August 2016, the China Banking Regulatory Commission ("CBRC") and other Chinese regulators "issued the Interim

Measures on Administration of Business Activities of Online Lending Information Intermediaries (the 'Interim Measures'), which established the regulatory framework for online P2P companies in China." [2]  (Id. ¶ 42)  These regulations prohibit P2P companies from engaging in certain business activities, cap the amounts they can lend, and require them to obtain operating licenses and to deposit investor funds in escrow accounts at qualified custodial banks.  (Id. ¶ 43)  Between October 2016 and August 2017, the CBRC issued a series of "implementation rules further clarifying the regulatory requirements."  (Id. ¶ 44)

After the Interim Measures and implementation rules were issued, the number of P2P companies operating in China dropped "from approximately 3,500 at the end of 2015 to less than 2,000 as of October 2017."  Plaintiff alleges that the drop in P2P companies resulted from a more restrictive business environment in China.  (Id. ¶¶ 46-50)  Plaintiffs contend that the Registration Statement should have disclosed that "a material portion of the financial service providers offering loans on Jianpu's platform were presently failing to comply with applicable PRC laws and regulations, including the licensing and custodial bank requirements imposed by the Interim Measures . . . and [that] heightened regulatory enforcement of the Interim Measures . . . was reasonably likely to . . . materially and adversely impact Jianpu's revenues. . . ."  (Id. ¶ 91)

As to the second alleged undisclosed risk, Plaintiff asserts that "the Registration Statement failed to disclose that a material portion of the loans offered by financial service

---

[2]  Defendants contend that "[t]he Interim Measures established general regulations for the broad category of 'online lending information intermediaries.'  Notably, and contrary to Plaintiff's characterization . . . , the Interim Measures did not specifically target 'P2P' lenders. . . ."  (Def. Br. (Dkt. No. 53) at 11)  Plaintiffs respond that this contention is "simply wrong, and contradict[s] the [Amended Complaint's] well-pled allegations."  (Pltf. Opp. Br. (Dkt. No. 57) at 28)  This dispute is not material to Defendants' motion, because Defendants do not deny that the Interim Measures apply to P2P lenders.

providers on Jianpu's platform featured annualized interest rates . . . in excess of 36%, in violation of PRC laws and regulations."  (Id. ¶ 51)  In April 2017, the CBRC and other regulators issued regulations providing "that the prohibition on annualized interest rates and fees in excess of 36% should be strictly enforced, and that regulators and local authorities should pay particular attention to lenders . . . with annualized interest rates above the 36% cap with excessive fees that drive up the true interest rate."  (Id. ¶ 55)  Plaintiff contends that the Registration Statement should have disclosed that "a material portion of the financial service providers offering loans on Jianpu's platform were presently failing to comply with applicable PRC laws and regulations, including . . . the 36% APR cap; and heightened regulatory enforcement of . . . the 36% APR cap was reasonably likely to . . . materially and adversely impact Jianpu's revenues . . . ."  (Id. ¶ 91)

On December 1, 2017, following the November 16, 2017 IPO, Chinese regulators "issued a notice setting forth a host of regulations . . . [which] prohibited loans with interest rates above the 36% annualized interest rate cap, and clarified that the 36% cap was an 'all-in' interest rate . . . [and] also prohibited unlicensed organizations and individuals from conducting a lending business. . . ."  (Id. ¶ 95 (emphasis in original))  On December 8, 2017, another Chinese regulator "issued a notice providing . . . that P2P companies must comply with the Interim Measures announced in August 2016 in order to qualify for licensing."  (Id. ¶ 96 (emphasis in original))

For the quarter ending March 31, 2018, "the growth in Jianpu's revenues from loan recommendation services slowed dramatically, to an increase of just 46.5% [year-over-year]" from 429% year-over-year in the previous quarter.  (Id. ¶ 102)  For the second quarter of 2018, revenues "increased by just 42.9% [year-over-year], and then decreased by 48.7% [year-over-year] in the third quarter of 2018, and decreased by 13.8% in the fourth quarter of 2018."  (Id. ¶ 104 (emphasis in original))  In a press release concerning 2018 financial results, "the

Company attributed the decrease in revenues from loan recommendation services in the fourth

quarter in part to 'online lending market adjustments pertaining to the new regulatory framework

since December 2017' . . . ."  (Id. ¶ 105 (emphasis in original))  "As of the filing of [the instant]

action on October 25, 2018, Jianpu's ADSs traded at $4.75 per ADS – a decline of

approximately 40% from the IPO price."  (Id. ¶ 107)

C.     **The Registration Statement's Characterizations and Disclosures**

The Registration Statement characterizes Jianpu's business environment and

potential risks as follows:

> We have attracted a large and diversified group of financial service providers in
> China to our platform.  In the first nine months of 2017, we worked with a total of
> over 2,500 financial service providers, including 257 banks, 21 credit card issuers,
> 10 consumer finance companies, 310 micro-loan companies and other licensed
> financial institutions and 746 emerging technology-enabled financial service
> providers and a variety of local financial service providers, offering a wide variety
> of financial products across a broad credit spectrum.

(Registration Statement (Dkt. No. 54-1) at 123)[3]

The Registration Statement states that

> [t]he key drivers for growth include . . . proliferation of new financial service
> providers, [and a] favorable regulatory environment such as interest rate
> liberalization[.]

(Id. at 10)

The Registration Statement warns, however, that

> [r]egulatory uncertainties relating to online consumer finance in China could harm
> our business, financial condition and results of operations.  Our business or the
> businesses of our financial service providers may be subject to a variety of PRC
> laws and regulations governing financial services.  The application and
> interpretation of these laws and regulations are ambiguous and may be interpreted
> and applied inconsistently between different government authorities.  In
> particular, the PRC government has not adopted a clear regulatory framework
> governing the new and rapidly-evolving online consumer finance market, which

---

[3]  The page numbers referenced in this Order correspond to the page numbers designated by this
District's Electronic Case Filing system.

is the source of the transactions that our platform facilitates.  As of the date of this prospectus, we have not been subject to any material fines or other penalties under any PRC laws or regulations on our business operations.  The PRC government may adopt a stringent regulatory framework for the online and mobile consumer finance market in the future, and impose specific requirements (including licensing requirements) on market participants.  The PRC government may also enhance the implementation of existing laws and regulations.  There has been media speculation that the PRC government may, among other things, (i) impose new regulations on fees and interest charged by financial service providers, (ii) introduce licensing requirements for online lenders, (iii) close down unlicensed financial service providers that take deposits from consumers and (iv) close down financial service providers that engage in illegal collection practices.  A significant number of financial service providers on our platform operate in the online and mobile consumer finance market.  Consequently, new government laws and regulations, stricter enforcement of existing laws and regulations or even speculation regarding such developments may materially and adversely affect our business, financial condition and prospects.  It may be costly for us to comply with applicable PRC laws and regulations.  If our practice is deemed to violate any existing or future laws and regulations, we may face injunctions, including orders to cease illegal activities, and may be subject to other penalties as determined by the relevant government authorities.

. . . .

If any financial product on our platform or the business practice of us or any of our financial service providers is deemed to violate any new or existing PRC laws or regulations, our business, reputation, financial condition and results of operations could be materially and adversely affected.  Financial products and financial institutions are strictly regulated in China.  We are not regulated as a financial institution, but we may be indirectly subject to PRC financial regulations as a result of the financial products on our platform and our services to and cooperation with financial service providers.  If any financial product on our platform is deemed to violate any PRC laws or regulations, we may be liable for listing the product or assisting in offering the product on our platform, even if we are not its provider.  If any of our financial service providers is deemed to violate any PRC laws or regulations, we may be jointly liable due to the services or solutions we provide.  We may have to remove financial products from our platform or terminate relationship with financial service providers.  As of the date of this prospectus, we have not been subject to any fines or other penalties under any PRC laws, rules or regulations.  However, if any financial product on our platform is deemed to violate any laws, rules or regulations, we may face, among others, regulatory warnings, correction orders, condemnation, fines and criminal liability.  As a result, our business, reputation, financial performance and prospects could be materially and adversely affected.

(Id. at 28, 30)

The Registration Statement also warns that the Company

may be adversely affected by the complexity, uncertainties and changes in PRC regulation of internet-related businesses and companies. The PRC government extensively regulates the internet industry, including foreign ownership and the licensing and permit requirements for companies in the internet industry. . . . These laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainties. As a result, in certain circumstances it may be difficult to determine what actions or omissions may be deemed to be in violation of applicable laws and regulations.
. . . .

The PRC government has not adopted a clear regulatory framework governing the young and rapidly evolving online consumer finance market, and we expect that the regulatory framework will remain unclear for some time to come.  If the PRC government adopts stringent regulations on financial service providers in the online consumer finance market, the growth of that market may slow, which may limit our growth.  If they impose specific requirements (including licensing requirements) on us, the requirements may be difficult or costly for us to comply with.

(Id. at 46, 85-86)

## II.   **PROCEDURAL HISTORY**

The Complaint was filed on October 25, 2018 (Dkt. No. 1), and the Amended Complaint was filed on March 28, 2019.  (Dkt. No. 30)  This case is brought as a putative class action, and the Amended Complaint alleges three causes of action under the Securities Act of 1933.  The First Cause of Action names all Defendants except Rong360 Inc. and alleges that the Registration Statement "was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein," in violation of Section 11 of the Securities Act, 15 U.S.C. § 77k.  (Id. ¶¶ 115-16)  The Second Cause of Action names all Defendants and alleges that, for the same reasons, the Registration Statement was in violation of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l.  (Id. ¶¶ 125, 128)  The Third Cause of Action names Rong360, Law Debenture, and the individual Defendants other than Manon, and alleges that these Defendants "committed primary violations of the Securities Act, or are directly

responsible and primarily liable for any such violations, by committing conduct in contravention of Sections 11 and 12(a)(2) or employing a violator," in violation of Section 15 of the Securities Act, 15 U.S.C. § 77o.  (Id. ¶¶ 133-34)

On September 19, 2019, Defendants moved to dismiss the Amended Complaint. (Dkt. No. 52)

On March 13, 2020, this Court denied Plaintiff's motion to strike certain exhibits filed by Defendants in connection with their motion to dismiss.  (Dkt. No. 64)

## DISCUSSION

## I.  LEGAL STANDARDS

### A.  Motions to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Allegations that "are no more than conclusions, are not entitled to the assumption of truth," however.  Iqbal, 556 U.S. at 679.  A pleading is conclusory "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" id. at 678, offers "'a formulaic recitation of the elements of a cause of action,'" id., or does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests."  Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007).  While legal

conclusions "can provide the complaint's framework, they must be supported by factual allegations."  Iqbal. 556 U.S. at 679.

    "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)).  For a document to be incorporated by reference, "the complaint must make 'a clear, definite and substantial reference to the documents.'"  DeLuca v. AccessIT Grp., Inc., 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting Helprin v. Harcourt, Inc., 277 F.Supp.2d 327, 330-31 (S.D.N.Y.2003)).  "[L]imited quotation" of a document, Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985), or a mere passing reference to a document outside of the complaint does not incorporate the document into the complaint.  See, e.g., Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint."); Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989) (although the amended complaint "discussed [certain] documents and presented short quotations from them[,]" these passing references and "brief[] excerpt[s]" are insufficient for incorporation by reference).

  **B.**  **Pleading Violations of the Securities Act**

    Section 11 of the Securities Act

imposes strict liability on issuers and signatories, and negligence liability on underwriters, where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

In re Facebook, Inc. IPO Sec. & Derivative Litig., 986 F. Supp. 2d 487, 505 (S.D.N.Y. 2013) (quoting 15 U.S.C. § 77k(a)).

> Section 12(a)(2) of the Securities Act
>
> imposes liability under . . . circumstances [similar to Section 11] for misstatements or omissions in a prospectus, on "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading."

Id. at 505-06 (quoting 15 U.S.C. § 77l (a)(2)).

"'Collectively, the language of sections 11 and 12(a)(2) creates three potential bases for liability . . . (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading.'" Id. at 506 (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010)).

"Every person who . . . controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

"In order to survive [a] motion to dismiss, Plaintiff must plead factual allegations sufficient to sustain the conclusion that the omissions in question were 'reasonably likely' to be material. . . ." In re Ply Gem Holdings, Inc. Sec. Litig., 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015) (quoting Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 716 (2d Cir. 2011)).

> The materiality requirement is satisfied when a plaintiff alleges "a statement or omission that a reasonable investor would have considered significant in making investment decisions." . . .  At this stage, a "complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not

material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."

Id. (quoting Ganino v. Citizens Utilities Co., 228 F.3d 154, 161-62 (2d Cir. 2000)).[4]

"[A] misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality."  This assumption can be overcome by qualitative factors, such as "whether a known misstatement may result in a significant positive or negative market reaction."

Yi Xiang v. Inovalon Holdings, Inc., 254 F. Supp. 3d 635, 642-43 (S.D.N.Y. 2017) (quoting

IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp.,

PLC, 783 F.3d 383, 390-91 (2d Cir. 2015) (citing 64 Fed. Reg. 45150-52 (Aug. 19, 1999)).

Section 11 requires disclosure of material facts that are "required to be stated

therein or necessary to make the statements therein not misleading . . . ."  See 15 U.S.C.A. § 77k.

Facts can be "required to be stated" based on "'affirmative legal disclosure obligation[s].'"  In re

Coty Inc. Sec. Litig., No. 14-CV-919 (RJS), 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016)

(quoting Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012)).

One such disclosure obligation arises from Item 303[5] of Regulation S-K, which requires that a

registration statement "'[d]escribe any known trends or uncertainties that have had or that the

---

[4]  Although Ganino addresses the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq., its discussion of materiality is relevant here, because "[t]he definition of materiality is the same for [Sections 11 and 12(a)(2) of the Securities Act] as it is under Section 10(b) of the Exchange Act[.]"  In re Deutsche Bank AG Sec. Litig., No. 09 CV 1714 (DAB), 2016 WL 4083429, at *16 (S.D.N.Y. July 25, 2016) (internal citations omitted).

[5]  "Though Item 303 does not apply to foreign corporations, the SEC has stated that its interpretations of Item 303 'apply to [Management Discussion & Analysis disclosures] drafted pursuant to Item 5 of Form 20-F,' which does apply to foreign corporations.  Accordingly, the Court will "interpret [Item 5 of Form 20-F] as calling for the same disclosure as Item 303 of Regulation S-K."  Christine Asia Co. v. Alibaba Grp. Holding Ltd., 192 F. Supp. 3d 456, 476 (S.D.N.Y. 2016) (internal quotations omitted) (first quoting In Re Comm'n Guidance Regarding MD & A of Fin. Condition & Results of Operation, Release No. 8350 (Dec. 19, 2003); then quoting Release No. 33-7745, 64 Fed. Reg. 53900, 59304 (Sept. 28, 1999)) (alterations in Christine Asia), vacated on other grounds and remanded sub nom. Christine Asia Co. v. Ma, 718 F. App'x 20 (2d Cir. 2017).

registrant reasonably expects will have a material . . . impact on net sales or revenues or income

from continuing operations.'" Id. (quoting 17 C.F.R. § 229.303(a)(3)(ii)) (first alteration in

original); see also In re CPI Card Grp. Inc. Sec. Litig., No. 16-CV-4531 (LAK), 2017 WL

4941597, at *2 (S.D.N.Y. Oct. 30, 2017) ("A registrant therefore violates Section 11 if the

registrant fails to disclose information required by Item 303, as Section 11 forbids the omission

of facts 'required to be stated.'"). "Item 303 . . . requires the registrant's actual knowledge of the

relevant trend or uncertainty." Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 95 (2d Cir.

2016).

        A related affirmative disclosure requirement is set forth in Item 503.[6]  "Item 503

of SEC Regulation S-K requires offering documents to include a 'discussion of the most

significant factors that make the offering speculative or risky' and 'how the risk affects the issuer

or the securities being offered.'"  In re Barclays Bank PLC Sec. Litig., No. 09 CIV. 1989 (PAC),

2017 WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017) (quoting 17 C.F.R. § 229.503(a), (c)), aff'd,

756 F. App'x 41 (2d Cir. 2018), as amended (Nov. 20, 2018).  "The same facts underlying an

Item 303 violation may also support an Item 503 violation, and a court's rationale for

determining the former may also support the same determination of the latter."  Id. (citing In re

Deutsche Bank AG Sec. Litig., No. 09-CV-1714 (DAB), 2016 WL 4083429, at *27 (S.D.N.Y.

July 25, 2016); Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 484 n.4 (2d Cir. 2011)).

"Although there is scant caselaw on Item 503, the inquiry can be boiled down to whether the

Offering Documents were accurate and sufficiently candid."  In re Deutsche Bank AG Sec.

---

[6]  Effective May 2, 2019, Item 503(c) became Item 105.  FAST Act Modernization and
Simplification of Regulation S-K, 84 Fed. Reg. 12674-01, 12688.  To avoid confusion, this Court
will refer to this provision as Item 503.  "The amendments to Item 503(c) relocate the current
risk factor disclosure requirements to Subpart 100 . . . without substantively changing the
underlying disclosure requirements." Id. at 12712.

Litig., 2016 WL 4083429, at *18 (internal quotation marks and citations omitted).  Failure to disclose information required by Item 503 can serve as the basis of a claim under Section 11.  Y-GAR Capital LLC v. Credit Suisse Grp. AG, No. 19 CIV. 2827 (AT), 2020 WL 71163, at *9 (S.D.N.Y. Jan. 2, 2020), appeal withdrawn, No. 20-441, 2020 WL 2128749 (2d Cir. Apr. 15, 2020).

Even in the absence of a specific disclosure obligation, there is a general requirement that a registration statement disclose facts "necessary to make the statements therein not misleading . . . ."  See 15 U.S.C.A. § 77k.

> In general there is no duty to disclose a fact in the offering documents merely because a reasonable investor would very much like to know that fact, but [d]isclosure is required . . . when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading. Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.

Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250-51 (2d Cir. 2014) (internal quotation marks and citations omitted).

"[P]laintiffs need not plead defendants' knowledge as there is no scienter requirement in Section 11."  In re Turkcell Iletisim Hizmetler A.S. Sec. Litig., 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001)).  Plaintiff must, however, "plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering."  Lin v. Interactive Brokers Grp., Inc., 574 F.Supp.2d 408, 421 (S.D.N.Y. 2008) (internal quotation marks and citation omitted).

"In evaluating a prospectus, we read it as a whole.  Our inquiry does not focus on whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities."  Demaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (internal

citations and quotation marks omitted).  "A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."  Meyer, 761 F.3d at 251.

## II.    ANALYSIS

### A.    Pre-IPO Violations of the Interim Measures

Plaintiff claims that Defendants violated Sections 11, 12, and 15 of the Securities Act by failing to disclose "Jianpu's exposure to financial service providers that were subject to regulations in China governing [P2P] lending, known as the Interim Measures – or that the Interim Measures were causing a decline in the number of P2P financial service providers operating in China at the time of the IPO."  (Am. Cmplt. (Dkt. No. 30) ¶ 4)

Defendants contend that the Amended Complaint fails to state a claim as to this alleged violation.

#### 1.    Whether Plaintiff Has Adequately Pled a Material Trend

Defendants contend that Jianpu "had no obligation . . . to disclose that, prior to the IPO, existing regulations were giving rise to a downward 'trend' in the number of 'P2P' lenders," because there is no alleged "impact on Jianpu before its IPO, much less a materially adverse one, from the alleged market-wide decline in the number of 'P2P' lenders."  (Def. Br. (Dkt. No. 53) at 22-23)

Plaintiff has not merely alleged a pre-IPO market-wide decline in P2P lenders, however.  The Amended Complaint also alleges that this decline was linked to pre-IPO violations of the Interim Measures by P2P lenders.  In this regard, Plaintiff cites a January 2017 report by a "Shenzhen-based financial web portal" stating that out of 2,307 financially-viable P2P companies operating in China, only 184 were compliant with the Interim Measures' escrow account requirement and only 424 had the required operating licenses.  (Am. Cmplt. (Dkt. No.

30) ¶ 46)  This report makes plausible Plaintiff's allegation that – in a market where 75% to 90%

of the participants are violating the Interim Measures – many of the 746 financial services

providers operating on Jianpu's platform were also violating the Interim Measures.[7]

Moreover, during a December 2017 conference call, Jianpu's top executives

disclosed that "non-licensed financial institutions" were responsible for "around 12% of

[Jianpu's] total revenue in November."  (Am. Cmplt. (Dkt. No. 30) ¶ 98; Fumerton Decl. (Dkt.

No. 54-12), Ex. L at 7)  It is unlikely that all such non-licensed financial services providers

joined Jianpu's platform in the second half of November, after the IPO.  Accordingly, this

allegation further supports an inference that a significant portion of financial services providers

operating on Jianpu's platform were violating the Interim Measures.

This Court concludes that Plaintiff has pled sufficient facts to demonstrate that a

significant portion of the financial services providers operating on Jianpu's platform were

violating the Interim Measures prior to the IPO.  The amount of revenue involved –

approximately 12% – exceeds the 5% threshold for presumptive materiality.  Yi Xiang, 254 F.

Supp. 3d at 642-43.

---

[7]  In response, Defendants argue that "'guilt by association' pleading is plainly insufficient as a matter of law," citing In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 695 (2d Cir. 2009).  (Def. Reply Br. (Dkt. No. 55) at 8)  In that case, the Second Circuit stated that "[a]lthough Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge. . . . In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible."  Id. (internal quotation marks and citations omitted).  "[C]laims under the Securities Act of 1933 are measured by Rule 8's notice pleading requirements[, however,] rather than Rule 9(b)'s particularity ones." Blackmoss Investments Inc. v. ACA Capital Holdings, Inc., No. 07 CIV. 10528, 2010 WL 148617, at *7 (S.D.N.Y. Jan. 14, 2010)  Accordingly, DDAVP is plainly not on point.  In any event, it is a fair inference that Jianpu would have been subject to the same circumstances discussed in the January 2017 report.

Plaintiff has also pled facts sufficient to demonstrate that the number of financial services providers operating in the broader lending market in China was declining.  As an initial matter, Plaintiff alleges that the above-mentioned January 2017 report states that "the growth rate of the P2P industry in 2016 had slowed to approximately half of the growth rate in 2014 and 2015 because of the Interim Measures and concerns over new P2P regulations."  (Am. Cmplt. (Dkt. No. 30) ¶ 46)  The Amended Complaint further alleges that a February 19, 2017 South China Morning Post article "cited a multi-agency report led by the Beijing Bureau of Financial Work predicting that '[n]ine out of 10 of the mainland's [P2P] lending platforms will struggle to survive this year as the government rolls out the tightened regulatory supervisions[.]'"  (Id. ¶ 48 (quoting Feb. 19, 2017 article) (first and third alterations in Am. Cmplt.))  And the Amended Complaint also alleges that in July 2017 "one of the largest P2P companies in China[] announced its exit from the industry, citing the Interim Measures' cap on borrowing amounts as hampering the growth of its . . . business."  (Id. ¶ 49)  Plaintiff also cites a report from Wangdaizhijia,[8] a P2P research firm, stating that the number of P2P companies operating in China declined "from approximately 3,500 at the end of 2015 to less than 2,000 as of October 2017 – the month prior to Jianpu's IPO."  (Id. ¶ 50)

In sum, the Amended Complaint cites facts suggesting that the P2P market was in rapid decline between the end of 2015 and the fall of 2017.  Although Defendants contend that Jianpu's business was still thriving as of the fall of 2017 (see Def. Reply Br. (Dkt. No. 55) at 13), the rapid decline in the number of P2P financial services providers – on whom Jianpu relied for a substantial part of its revenue – was not "so obviously unimportant to a reasonable investor that

---

[8]  The Amended Complaint does not disclose the date of this report.

reasonable minds could not differ on the question of [its] importance." Ply Gem, 135 F. Supp. 3d at 150 (internal quotation marks and citations omitted).

        The Court concludes that Plaintiff has adequately alleged that there was material information available about (1) financial services providers' non-compliance with the Interim Measures; (2) the fact that many of these financial services providers used Jianpu's platform; and (3) the possible effects of their non-compliance on Jianpu's business, and that Defendants were obliged to disclose this information under Items 303 and 503.

### 2.     Whether Plaintiff Has Adequately Pled Defendants' Knowledge

        Defendants argue that "Plaintiff fails to plead that any of the Defendants had 'actual knowledge' of the alleged 'trend'" regarding the declining number of P2P financial services providers.  (Def. Br. (Dkt. No. 53) at 22)  According to Defendants, "[w]hile Section 11 claims generally do not require pleading scienter, Item 303's knowledge requirement imposes an obligation on Plaintiff to plead, with specificity, facts establishing that the defendant had actual knowledge of the purported trend."  (Id. at 22-23 (citing Indiana Pub. Ret. Sys., 818 F.3d at 95 (emphasis in original)))  Defendants assert that "Plaintiff expressly disclaims any such allegation here."  (Id. at 23 (citing Am. Cmplt. (Dkt. No. 30) ¶¶ 115, 125, 133))

        While Item 303 "requires a description of 'any known trends or uncertainties'" that are material, City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (quoting 17 C.F.R. § 229.303(a)(3)(ii)) (emphasis added), "plaintiffs need not plead defendants' knowledge[,] as there is no scienter requirement in Section 11."  Turkcell, 202 F. Supp. 2d at 12.  Moreover, because Item 503 requires "'a discussion of the most significant factors that make the offering speculative or risky,'" "courts typically analyze the sufficiency of Item 503 disclosures with the familiar materiality standard."  City of Roseville,

814 F. Supp. 2d at 426 (quoting 17 C.F.R. § 229.503(c)).  In sum, Plaintiff need not allege

Defendants' knowledge in order to plead an Item 503 violation.

In any event, the Amended Complaint explicitly alleges that the trends underlying

Plaintiff's allegations – including the P2P financial services providers' lack of compliance with

the Interim Measures, and the impact that their lack of compliance would have on the P2P

financial services providers and ultimately on Jianpu's business – were "known" to Defendants.

(Am. Cmplt. (Dkt. No. 30) ¶ 91)  This allegation is plausible given multiple public reports –

cited in the Amended Complaint – to the effect that "the Interim Measures were widely expected

to lead to an exodus of P2P companies from the online consumer finance market."  (Id. ¶¶ 45-49)

Although the Amended Complaint does not allege "that any of the [D]efendants

. . . engaged in intentional or reckless misconduct or acted with fraudulent intent" (id. ¶¶ 115,

125, 133), this circumstance is irrelevant.  The issue is whether the above-described trends were

"known" for purposes of Item 303, not whether Defendants acted with fraudulent intent.  The

Amended Complaint's allegations are consistent with Plaintiff pleading obligations in alleging

violations of Sections 11, 12, and 15; as noted above, these provisions have no scienter

requirement.  Turkcell, 202 F. Supp. 2d at 12.

The Court concludes that Plaintiff has adequately pleaded knowledge for purposes

of Item 303, and finds that Item 503 has no knowledge requirement.

### 3.     Whether Defendants' Disclosures Were Sufficient

Defendants argue that they disclosed:  (1) Jianpu's "[e]xtensive and diversified

network of [financial service providers ('FSPs')], which includes . . . emerging technology-

enabled [FSPs]"; (2) "the general attributes of the loan products available on its platform"; (3)

"that all FSPs on Jianpu's platform, including emerging technology-enabled FSPs (and therefore

'P2P' lenders), were already subject to regulations"; and (4) that Jianpu "depend[ed] on FSPs for

its continuing success and the various risks – regulatory, reputational, relational, etc. – that might

threaten its symbiotic relationship with the FSPs."  (Def. Br. (Dkt. No. 53) at 19-21 (internal

quotation marks and citations omitted) (emphasis in original)).

Plaintiff counters that these disclosures were insufficient because they fail to

disclose that "a significant portion of the FSPs offering loans on Jianpu's platform were currently

failing to comply with . . . the licensing and custodial bank requirements of the Interim

Measures[.]"  (Pltf. Opp. Br. (Dkt. No. 57) at 17 (citing Am. Cmplt. (Dkt. No. 30) ¶ 77))

Defendants also did not disclose that "the Interim Measures were causing a decline in the

number of P2P companies operating in China at the time of the IPO."  (Id. at 10 (citing Am.

Cmplt. (Dkt. No. 30) ¶¶ 4, 38))  Plaintiff contends that the FSPs' non-compliance created a

"presently-existing risk that [Chinese] authorities would take action to rectify FSPs' current non-

compliance – either by stepping up enforcement of existing regulations, or by introducing new

and tougher regulations."  (Id. at 29 (emphasis in original))

Although Defendants cite a number of general statements in the Registration

Statement that address risks from regulation, these statements are all framed as hypotheticals.

(Def. Br. (Dkt. No. 53) at 20)  For example, the Registration Statement states that (1) "[t]he PRC

government has not adopted a clear regulatory framework governing the young and rapidly

evolving online consumer finance market" (Registration Statement (Dkt. No. 54-1) at 85); (2)

"[t]he PRC government may also enhance the implementation of existing laws and regulations"

(id. at 28); (3) "new government laws and regulations [or] stricter enforcement of existing laws

and regulations . . . may materially and adversely affect our business" (id.); and (4) "[i]f any

financial product on our platform or the business practice of us or any of our financial service

providers is deemed to violate any new or existing PRC laws or regulations, our business,

reputation, financial condition and results of operations could be materially and adversely affected.  Financial products and financial institutions are strictly regulated in China."[9]  (Id. at 30)

The Court acknowledges that certain of Jianpu's disclosures specifically mention licensing requirements.  (See Def. Br. (Dkt. No. 53) at 25-26)  For example, the Registration Statement states that (1) "[t]he PRC government may . . . impose specific requirements (including licensing requirements) on market participants" (Registration Statement (Dkt. No. 54-1) at 28); (2) "[t]here has been media speculation that the PRC government may . . . introduce licensing requirements for online lenders" (id.); and (3) "[i]f [the PRC government] impose[s] specific requirements (including licensing requirements) on us, the requirements may be difficult or costly for us to comply with."  (Id. at 85-86)  These disclosures are all framed as mere hypotheticals, however, and thereby imply that the risk of regulation is a theoretical one, rather

---

[9]  Defendants contend that this disclosure is "nearly [a] mirror image[]" of a warning given in a recent Section 11 case, in which the court granted defendants' motion to dismiss.  (July 27, 2020 Def. Ltr. (Dkt. No. 65) at 2)  In Jiajia Luo v. Sogou, Inc., No. 19-CV-230 (LJL), 2020 WL 3051019 (S.D.N.Y. June 8, 2020), a Chinese internet search-engine company issued an American IPO on November 9, 2017, and by the following year its share price had fallen by more than half.  Id. at *1.  In April 2018, Chinese authorities issued a law prohibiting certain kinds of advertisements, and an advertisement on the company's search engine was found to violate the new law, resulting in a fine.  Id. at *3.  Investors sued the company, claiming that it had "failed to disclose that its screening mechanisms at the time of the IPO were inadequate to screen out content that new Chinese law (passed after the IPO) would prohibit."  Id. at *9 (emphasis in original).  The court dismissed the claim, in part because "the Prospectus warned investors of exactly the risk the plaintiffs claim was not disclosed. . . . It stated:  'We may have difficulty determining the type of content that may result in liability for us and, if we are wrong, we may be prevented from operating our Internet platforms.'"  Id. at *11 (internal quotation marks and citations omitted).  Jiajia Luo is not on point here, because in that case the company disclosed that its compliance measures were fallible, and warned that an incorrect guess as to future Chinese regulation might be disastrous for its business.  Id. at *9.  In the instant action, Plaintiff does not complain about a failure to disclose risks resulting from possible future regulation.  Plaintiff instead complains that Defendants did not disclose risks to Jianpu's business resulting from actual violations of existing regulations.

than – as Plaintiff alleges – a risk that has already materialized in the marketplace.  "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."  Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004).

The Court also acknowledges that the Registration Statement warns that "[t]he PRC government extensively regulates the internet industry, including . . . licensing and permit requirements for companies in the internet industry."  (Registration Statement. (Dkt. No. 54-1) at 46)  This disclosure refers to a section of the Registration Statement entitled "Regulations Related to Value-added Telecommunications Services" (id. at 141), however, and Plaintiff plausibly argues that this disclosure can reasonably be interpreted as relating only to "the licenses that Jianpu was required to hold . . . [,] not the licensing requirements for the P2P lenders on its platform."  (Pltf. Opp. Br. (Dkt. No. 57) at 16 n.4)  Drawing all reasonable inferences in Plaintiff's favor, Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc., 422 F. Supp. 3d 821, 837 (S.D.N.Y. 2019), this Court finds Defendants' disclosure insufficient.  The Court notes that even if this section of the Registration Statement were read to address the licenses required under the Interim Measures – despite not mentioning the Interim Measures by name – it does nothing to inform investors that financial services providers operating on Jianpu's platform do not currently hold such licenses.

As for the decline in the number of P2P financial services providers in the broader Chinese market, Defendants do not claim to have disclosed that fact.  (See generally Def. Reply Br. (Dkt. No. 55) at 12-14)

"In evaluating a prospectus, [courts] read it as a whole."  DeMaria, 318 F.3d at 180 (internal citations and quotations omitted).  Accordingly, Defendants' disclosures regarding regulation must be read together with other statements that portray a P2P lending market in a

bullish manner:  (1) "we benefit from a trend towards smaller and shorter duration loans to the

extent that they result in larger numbers of loans being taken out more frequently" (Registration

Statement (Dkt. No. 54-1) at 87); (2) "China's population has been increasing its consumption,

which has driven the demand for consumer loans.  As a result, a broad range of financial service

providers . . . offer consumer loan products through our platform" (id. at 126); and (3) "China's

rapid economic growth has been accompanied by the emergence of a growing middle class

population driving strong domestic consumption. . . . The key drivers for growth include changes

in consumer attitudes due to China's economic transformation, increasing focus by financial

service providers on historically underserved mass market, shift of consumer demand from

offline to online, [and the] proliferation of new financial service providers. . . ."  (Id. at 9-10)

        These statements do not disclose that the PRC has already adopted a regulatory

framework – the Interim Measures – that requires licensing and custodial bank accounts, and that

financial services providers operating on Jianpu's platform are violating those regulations.

Defendants claim that "compliance with these provisional attempts at regulation – as the very

name Interim Measures suggests – was not mandatory until after the IPO," and that they "fully

and completely disclosed" the risk that Chinese authorities might enhance regulation and

enforcement.  (Def. Reply Br. (Dkt. No. 55) at 8)  Defendants likewise assert that "[t]he

Company clearly disclosed that FSPs on its platform were subject to extensive regulations. . . .

Indeed, the Company went even further and warned that these regulations might become

increasingly stringent after the IPO."  (Id. at 10)

        The Registration Statement's disclosures do not reveal what Plaintiff alleges,

however:  that financial services providers operating on Jianpu's platform were not in

compliance with existing regulations.  "A generic warning of a risk will not suffice when

undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability."  Meyer, 761 F.3d at 251.

Moreover, although the Amended Complaint cites a post-IPO December 8, 2017 notice requiring "that P2P companies . . . comply with the Interim Measures announced in August 2016 in order to qualify for licensing" (Am. Cmplt. (Dkt. No. 30) ¶ 96 (emphasis in original)), as Plaintiff points out, the post-IPO enforcement of the Interim Measures "did not come out of the blue."  (Pltf. Opp. Br. (Dkt. No. 57) at 28)  It should have been obvious that once the PRC enacted regulations governing P2P financial services providers – such as the Interim Measures – compliance would eventually be required.  In sum – given Jianpu's reliance on revenue from P2P financial services providers operating on its platform – a reasonable investor would likely have considered it significant that these same financial services providers were actively violating regulations already in place.

The Registration Statement also does not disclose the rapid contraction taking place among P2P financial services providers.  The financial services provider market was not merely "rapidly evolving."  Instead, a significant subset of that market – P2P lenders – had contracted from 3,500 lenders to 2,000 lenders, a decrease of more than 40% in the two years leading up to the IPO.  (Id. ¶ 50)

Defendants' bullish statements about the financial services provider market create a disclosure requirement, because "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context.  Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate."  Morgan Stanley Info. Fund, 592 F.3d at 366 (internal citations and quotations omitted).  "Sections 11 and 12(a)(2) both

call for the disclosure of information that is necessary to avoid rendering misleading the representations in registration statements and prospectuses." Id. at 365 (citing 15 U.S.C. §§ 77k(a), 77l(a)(2)). Accordingly, to correct the misleading impression created by Defendants' bullish statements concerning the financial services provider market, Jianpu was obligated to describe the regulatory framework then in place – nascent though it may have been – and disclose the impact of that regulation on the market, including the fact that the financial services providers on whom it relied for a substantial portion of its revenue were not in compliance.

Finally, Defendants argue that Plaintiff's claims "fail[] because any pre-IPO Chinese laws and regulations were publicly available." (Def. Reply Br. (Dkt. No. 55) at 11) Acknowledging that the laws and regulations were publicly available, Jianpu did not disclose the existence and extent of violations of those laws and regulations by financial service providers operating on its platform, or the possible impact of those violations on Jianpu's future business.

This Court concludes that Plaintiff has adequately pled an actionable omission under Sections 11 and 12(a) of the Securities Act as to pre-IPO violations of the Interim Measures by financial services providers operating on Jianpu's platform.

**B.    36% APR Cap**

The Amended Complaint alleges that "the Registration Statement fail[s] to disclose that a material portion of the loans offered by [financial services providers] on Jianpu's platform featured annualized interest rates [("APR")] in excess of 36%, in violation of PRC laws and regulations." (Am. Cmplt. (Dkt. No. 30) ¶ 51)) Defendants contend that Plaintiff's allegations premised on this omission fail to state a claim. (Def. Br. (Dkt. No. 53) at 26-28)

**1.    Whether Plaintiff Has Adequately Pled a Material Risk**

Defendants argue that "the applicable regulations clarifying the 36% cap and imposing stringent licensing requirements were introduced on December 1 and December 8,

2017 – weeks <u>after</u> Jianpu's November 16, 2017 IPO."  (Def. Br. (Dkt. No. 53) at 26 (citing Am.

Cmplt. (Dkt. No. 30) ¶¶ 95-97) (emphasis in original))  According to Defendants, Jianpu could

not "be expected to disclose anything beyond the <u>risk</u> of additional regulations or enhanced

enforcement," and in fact it "disclosed the risks of entirely new regulations . . . <u>and</u> enhanced

implementation and enforcement."  (<u>Id.</u> at 27 (emphasis in original) (internal citations and

quotation marks omitted))  While Defendants acknowledge a 2015 ruling of China's Supreme

People's Court "that any loan agreement requiring the payment above an annualized rate of 36%

was void to the extent the interest exceeded that rate," Defendants claim that "the court did not

specify how this rate was to be calculated," nor did it "prohibit[] all loans with interest rates over

36%. . . ."  (<u>Id.</u> at 15)  As to the APR calculation method, Defendants argue that "it was only

<u>after</u> the IPO that new rules required miscellaneous fees to be included in the interest rate

calculation."  (Def. Reply Br. (Dkt. No. 55) at 9)

       Plaintiff counters that, at the time of the IPO, "the FSPs on Jianpu's platform were

<u>already</u> 'subject to a variety of PRC laws and regulations governing financial services,' including

the Interim Measures and the 36% APR cap."  (Pltf. Opp. Br. (Dkt. No. 57) at 16 (emphasis in

original))  Plaintiff further contends that (1) the 2015 ruling applied to "the interest rate []

including penalties and fees" (Am. Cmplt. (Dkt. No. 30) ¶ 53); and (2) regulations in April 2017

"provided that the prohibition on annualized interest rates and fees in excess of 36% should be

strictly enforced, and local authorities should pay particular attention to cash loans with

excessive fees that drive up the true interest rate."  (Pltf. Opp. Br. (Dkt. No. 57) at 11 (citing Am.

Cmplt. (Dkt. No. 30) ¶ 55))

       Nothing in the record suggests that the 2015 ruling has any language suggesting

that the APR cap does not include associated fees and penalties.  Moreover, Defendants ignore

Plaintiff's allegations concerning the April 2017 CBRC regulations, which – as set forth above – allegedly provide that "the prohibition on annualized interest rates and fees in excess of 36% should be strictly enforced, and that regulators and local authorities should pay particular attention to lenders of cash loans with annualized interest rates above the 36% cap and with excessive fees that drive up the true interest rate." (Am. Cmplt. (Dkt. No. 30) ¶ 55)  Defendants instead point to an analyst report stating that "prior to the IPO, 'the regulators ha[d] not released [an] official definition of [] "interest rate"'" until the December 1, 2017 notice.  (Def. Reply Br. (Dkt. No. 55) at 9 (alterations in Def. Reply Br.))

"Insofar as [Defendants'] contentions appear to take issue with [Plaintiff's] allegations, they serve merely to confirm that material factual disputes exist that cannot be resolved on a motion to dismiss."  Van Dongen v. CNinsure Inc., 951 F. Supp. 2d 457, 470 (S.D.N.Y. 2013).  Accordingly, to the extent that Defendants contend that there was not a 36% APR cap in place before the IPO, that factual disagreement cannot be resolved on the instant motion in light of Plaintiff's well-pled allegations to the contrary.  The Court also notes that – to the extent that Defendants' alternative timeline suggests increased enforcement of existing regulations – Defendants' chronology is not inconsistent with Plaintiff's allegations, which describe the December 2017 measures as "regulations designed to enhance governmental enforcement of both the Interim Measures (including their licensing requirements) and the 36% APR cap."  (Am. Cmplt. (Dkt. No. 30) ¶ 94 (emphasis added))  The Court concludes that Plaintiff has plausibly alleged that a 36% APR cap was in place before the IPO.

Plaintiff has also alleged that many of the P2P financial services providers operating on Jianpu's platform were violating this 36% APR cap, citing

a December 20, 2017 J.P. Morgan analyst report . . . [that] as of October 25, 2017 – shortly before the IPO – "most" loan products offered on Jianpu's platform

featured annualized interest rates <u>greater than 36%</u>, and as high as 540%.  Citing
[Jianpu] data, the report also stated that as of December 15, 2017 – one month
after the IPO, following additional regulations designed to step up enforcement of
the 36% APR cap – "most products" with annualized interest rates greater than
36% had "been delisted" from Jianpu's platform.

(Am. Cmplt. (Dkt. No. 30) ¶ 56 (emphasis in original))  Defendants do not dispute this report.

Accordingly, the Court concludes that Plaintiff has sufficiently pled that most of the P2P

financial services providers operating on Jianpu's platform prior to the IPO were violating the

36% APR cap.

   The Court further concludes that these violations were material, because "most"

of the loan products on Jianpu's platform violated the 36% APR cap.  "At this stage, a complaint

may not properly be dismissed on the ground that the alleged misstatements or omissions are not

material unless they are so obviously unimportant to a reasonable investor that reasonable minds

could not differ on the question of their importance."  <u>Ply Gem</u>, 135 F. Supp. 3d at 150 (internal

quotation marks and citations omitted).

   In sum, Plaintiff has adequately pled a material risk stemming from alleged

violations of the 36% APR cap.  Defendants were obligated to disclose this risk under Items 303

and 503.[10]

### 2. Whether Defendants' Disclosures Were Sufficient

   With respect to the risk to Jianpu's business presented by the 36% APR cap,

Defendants argue that (1) "the Offering Documents disclosed the risk that lenders on Jianpu's

platform were subject to existing regulations, as well as the potential for new and heightened

regulation, that could, in turn, materially affect the Company's operations"; and (2) "Jianpu's

---

[10]  For the same reasons discussed above in connection with the Interim Measures, Plaintiff has
adequately pled Defendants' knowledge for purposes of Item 303.  (<u>See</u> Am. Cmplt. (Dkt. No.
30) ¶¶ 45-49, 91)  As is also discussed above, such knowledge is not required as to Item 503.

FSPs were not in violation of the licensing and 36% interest rate restrictions at the time of the IPO, and Jianpu could not have foretold post-IPO regulatory changes."  (Def. Br. (Dkt. No. 53) at 25)

As to the first argument, Defendants point to the same disclosures discussed above in connection with the Interim Measures.  (Id. at 25-26; Def. Reply Br. (Dkt. No. 57) at 10-11)  As already explained, these vague disclosures are not sufficient, because they are framed as hypotheticals and do not even reference the 36% APR cap, much less explain the nature and magnitude of the risk it presented to Jianpu's business.  Moreover, while the Registration Statement references "media speculation that the PRC government may, among other things:  (i) impose new regulations on fees and interest charged by [FSPs], [and] (ii) introduce licensing requirements for online lenders" (Registration Statement (Dkt. No. 54-1) at 28), this disclosure does not reveal that a 36% APR cap was already in place pursuant to the April 2017 CBRC regulations.  (Am. Cmplt. (Dkt. No. 30) ¶¶ 55, 74-75)

"Sections 11 and 12(a)(2) both call for the disclosure of information that is necessary to avoid rendering misleading the representations in registration statements and prospectuses."  Morgan Stanley Info. Fund, 592 F.3d at 365 (citing 15 U.S.C. §§ 77k(a), 77l(a)(2)).  Moreover, "[s]ome courts in this Circuit have held that a risk disclosure can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired."  Chapman v. Mueller Water Prod., Inc., No. 19-CV-3260 (LJL), 2020 WL 3100243, at *15 (S.D.N.Y. June 11, 2020) (citing In re Mylan N.V. Sec. Litig., No. 16-CV-7926 (JPO), 2018 WL 1595985, at *9 (S.D.N.Y. Mar. 28, 2018) ("the more specific the caution, the more likely it is to mislead a reasonable investor").  A reasonable investor reading about "media speculation" that the PRC might "impose new regulations on fees and interest" could well infer

that there were no current "regulations on fees and interest" – or violations thereof – that warranted concern, and thus would have been misled as to the existing 36% APR cap and the risk it presented to Jianpu's business.

Defendants' second argument – that none of the P2P financial services providers operating on Jianpu's platform were violating PRC regulations, because no such regulations were in place – fails, because it contradicts Plaintiff's well-pleaded allegations that there was in fact a 36% APR cap in place.  See Van Dongen, 951 F. Supp. 2d at 470.

This Court concludes that Plaintiff has adequately pled an actionable omission under Sections 11 and 12(a) of the Securities Act as to pre-IPO violations of the 36% APR cap by financial services providers operating on Jianpu's platform.

### C.    Whether the Negative Loss Causation Doctrine Bars Plaintiff's Claims

Defendants contend that Plaintiff's claims "should be dismissed under the doctrine of negative causation," because "Plaintiff's alleged 'revelations' all dealt with post-IPO events," and Defendants "cannot be liable for failing to disclose events that were either unknown or unknowable at the time of the disclosures."  (Def. Br. (Dkt. No. 53) at 28, 30; Def. Reply Br. (Dkt. No. 55) at 14 (internal quotation marks omitted))

Plaintiff counters that "loss causation may be pled by alleging that 'the loss was caused by the materialization of the risk concealed by the defendant's alleged' misstatements or omissions."  (Pltf. Opp. Br. (Dkt. No. 57) at 30 (quoting In re Vivendi S.A. Sec. Litig., 838 F.3d 223, 261 (2d Cir. 2016) (internal quotation marks omitted)))

"[L]oss causation is an affirmative defense to be proven by defendants, not a prima facie element to be proven by plaintiffs. . . . The burden to prove negative loss causation is heavy. . . ."  Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 153 (2d Cir. 2017) (internal citations and quotation marks omitted).

Here, Plaintiff has plausibly alleged that Defendants concealed the business risks presented by then-existing violations of then-existing regulations, and that post-IPO "[e]nhanced enforcement of the Interim Measures and the 36% APR cap did in fact have a material, adverse effect on Jianpu's revenues from loan recommendation services – causing Jianpu to report a marked slow-down in growth, followed by a decline, in its revenues from loan recommendation services."  (Am. Cmplt. (Dkt. No. 30) ¶ 101)

Defendants' alternative chronology – in which the risk was entirely hypothetical until post-IPO regulations were introduced – presents a factual dispute that cannot be resolved on a motion to dismiss.  Van Dongen, 951 F. Supp. 2d at 470.  As explained above, Plaintiff has adequately alleged that there was a material risk caused by alleged violations of the Interim Measures and of the 36% APR cap by financial services providers operating on Jianpu's platform prior to the IPO.  The fact that Jianpu's business did not decline until after the IPO is not inconsistent with Plaintiff's allegation that the risk posed by pre-IPO violations materialized in the face of greater enforcement.  Plaintiff's well-pleaded allegation of "materialization of risk," Vivendi, 838 F.3d at 261, suffices to preclude Defendants from meeting their "heavy" burden in arguing this affirmative defense, particularly on a motion to dismiss.  Nomura, 873 F.3d at 153.

Finally, Defendants' argument that "the price of Jianpu's ADSs had already fallen 36.5% from the IPO price . . . [by] November 30, 2017" (see Def. Br. (Dkt. No. 53) at 29) goes to the issue of damages, and not to liability.

Accordingly, the doctrine of negative loss causation does not bar Plaintiff's claims.

      **D.**    <u>**Whether Plaintiff Has Adequately Pled Control Person Liability**</u>

Defendants' only argument as to Plaintiff's Section 15 claims for control person liability is that "Plaintiff's Section[] 11 and 12 claims fail. . . ."  (Def. Br. (Dkt. No. 53) at 31)  This Court has rejected that argument.  Accordingly, Defendants' motion to dismiss Plaintiff's Section 15 claims will be denied.

<u>**CONCLUSION**</u>

For the reasons stated above, Defendants' motion to dismiss is denied.  The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 52, 56).

The initial pretrial conference in this matter will take place telephonically on **October 29, 2020 at 11:00 a.m.**  The parties are directed to dial 888-363-4749 to participate, and to enter the access code 6212642.  The press and public may obtain access to the telephone conference by dialing the same number and using the same access code.  The Court is conducting multiple telephone conferences on this date.  The parties should call in at the scheduled time and wait on the line for their case to be called.  At that time, the Court will un-mute the parties' lines. Seven days before the conference, the parties must email Michael_Ruocco@nysd.uscourts.gov and GardepheNYSDChambers@nysd.uscourts.gov with the phone numbers that the parties will be using to dial into the conference so that the Court knows which numbers to un-mute.  The email should include the case name and case number in the subject line.

Seven days before the conference, the parties will submit a joint letter addressing the following in separate paragraphs:  (1) a brief description of the case, including the factual and legal bases for the claims and defenses; (2) any contemplated motions; and (3) the prospect for settlement.  For the Court's convenience, the parties must set forth the conference's date and

time in the joint letter's opening paragraph.  In preparing their joint letter and proposed case

management plan, the parties will consult the Court's Individual Practices and model Case

Management Plan and Scheduling Order – both of which are available on this District's website.

Dated: New York, New York
   September 27, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge